The OFFICERS FOR JUSTICE et al., Plaintiffs,

v.

The CIVIL SERVICE COMMISSION OF the CITY AND COUNTY OF SAN FRANCISCO et al., Defendants.

UNITED STATES of America, Plaintiffs,

v.

The CITY AND COUNTY OF SAN FRANCISCO et al., Defendants.

Nos. C-73-0657, C-77-2884 RFP.

United States District Court,
N. D. California.

March 30, 1979.
On Motion to Intervene April 16, 1979.

Robert L. Gnaizda, Lois Salisbury, Public Advocates, Inc., San Francisco, Cal., Oliver Jones, Counsel to NAACP (Western Region), Oakland, Cal., for plaintiffs The Officers for Justice.

Gerald F. George, Linda C. Jamieson, U. S. Atty., Maimon Schwartzchild, Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff United States of America.

George Agnost, City Atty., Michael C. Killelea, Philip S. Ward, San Francisco, Cal., for defendant The Civil Service Commission of the City and County of San Francisco.

Jerome A. DeFilippo, San Francisco, Cal., for defendant Charles Gain, Chief of Police, San Francisco Police Dept.

Stephen W. Soloman, Ralph B. Saltzman, Marina del Rey, Cal., for intervenor Police Officers Assn.

## ORDER

PECKHAM, Chief Judge.

This court is now asked to approve a settlement agreement reached by all parties in this case. The proposal represents the culmination of almost six years of litigation that included several preliminary injunctions and orders, a settlement tentatively agreed to that eventually collapsed, and two weeks of actual trial before a recess that led to weeks of hard bargaining by all the parties that produced this final agreement. As we have stated on numerous previous occasions, this suit involves issues of extraordinary sensitivity and importance—to the parties who have brought it and to the members of minority groups that they represent, to the incumbent members of the San Francisco Police Department, to the governing bodies and institutions of San Francisco and their members, and to the entire community of this City.

In considering the merits of this proposed decree, we are mindful not only of the favored status of settlements in Title VII litigation, but also the advantages to the parties and the community offered by a consensual resolution of this lawsuit—the avoidance of a long, public and divisive trial of the Police Department and related City institutions and their members, with an outcome potentially involving court-imposed remedies uncomfortable for all and popular with no one. We have considered formal objections filed in response to the court's public notice of a proposed settlement. We discuss below those submissions—one filed by a group of sergeants in the department who protest the decree's effects on their rights and standing, and another filed by a named plaintiff who contends that the decree provides inadequate redress and prospective relief. In short, we have attempted to consider the interests of everyone touched by the proposed settlement of this suit, as well as the facts already established and the relevant law.

### History of the Case

A brief historical summary of this litigation will give a proper perspective on the task at hand. In 1973, the private plaintiffs, including individual victims of discrimination and organizations representative of the interests of various minority groups in San Francisco, brought suit against the San Francisco Civil Service Commission, the Police Commission of San Francisco, and the Chief of the San Francisco Police Department, charging racial and sexual discrimination in the employment practices of the department. The San Francisco Police Officers Association (POA) intervened as defendants. In November of 1973 this court issued a preliminary injunction barring the use of discriminatory entrance and sergeant's promotional examina-

tions and imposing a quota of three minority applicants for every two nonminority applicants in hiring patrol officers and a quota of one-for-one in permanent promotions to sergeant. 371 F.Supp. 1328 (N.D. Cal.1973). In 1975 we enjoined the use of the 5'6" minimum height requirement for Q-2 patrol officers, imposed a temporary quota for hiring women to Q-2 positions, and ordered that the physical agility test be scored and weighted so as not to discriminate against women applicants. By then a new Q-2 exam had been developed whose overall impact on minorities was acceptable, so the three-for-two entry level quota was dissolved. 395 F.Supp. 378 (N.D.Cal.1975). In 1977 the one-for-one quota was extended to the temporary appointment of sergeants. 14 E.P.D. 7548 (N.D.Cal.1977). However, the U. S. Court of Appeals for the Ninth Circuit stayed that order pending its appeal. The use of a discriminatory Q-35 assistant inspector's exam was enjoined. 14 E.P.D. 7549 (N.D.Cal.1977). The United States also sued the City for discriminatory employment practices in 1977, and its suit was consolidated with the private plaintiffs' suit. In the spring of 1978 the public and private plaintiffs and counsel for the City reached a tentative settlement. However, the POA vigorously opposed it and a majority of the Board of Supervisors of the City refused to approve it. In September 1978 we granted the government's motion for partial summary judgment with respect to entry-level examinations given in 1969-72 and the Q-50 sergeant's exam given in 1971. The use of these exams was held to violate Title VII of the Civil Rights Act of 1964, the State and Local Fiscal Assistance Act of 1972, and the Omnibus Crime Control and Safe Streets Act of 1968. Trial of the race discrimination issues commenced in November 1978 and recessed after two weeks for further settlement negotiations which eventually produced the instant proposal filed with the court on January 25, 1979. Notice of the proposed settlement was sent to all identifiable members of the class and published in various newspapers. A hearing on the fairness of the proposed consent decree was held on March 5, 1979, and the proposal and objections to it were taken under submission.

Because this settlement was reached after but two weeks of trial, complete findings of fact and conclusions of law were not made, but that does not mean that what went on before is without significance in considering approval of this consent decree. The long history of this litigation includes various evidentiary hearings, stipulations, and findings and conclusions previously made by this court, and it forms an essential part of the record upon which this court must base its decision. We summarize some of its essential aspects.

■ The ethnic composition of the San Francisco Police Department at the outset and throughout this litigation differed significantly from the ethnic make-up of the City and County of San Francisco. Blacks, Hispanics and Asians were and continue to be substantially underrepresented. This disparity is even more pronounced in the upper ranks of the department—assistant inspector, sergeant and above. Written examinations for the selection of patrol officers and for promotions to sergeant that were administered from 1969 to 1972 displayed a substantial adverse statistical impact on minorities who took them. The job-relatedness of these exams was not established, and their use constitutes a violation of section 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a).

■ The 5'6" pre-selection minimum height requirement that was used by the City until enjoined by this court also impacts adversely on Hispanics, Asians and women. As such it presents a *prima facie* case of employment discrimination, unrebutted by defendants in this action.

Before the filing of this action, women were totally excluded from the position of patrol officer in the San Francisco Police Department, and Q-20 policewomen were not eligible for promotion to the rank of sergeant or higher. The physical agility

test that was administered to applicants when the position of Q–2 patrol officer was opened to women had a very significant adverse impact on women. The City was unable to establish the validity of this test during this litigation, and its use was modified by an order of this court.

We also note the adverse statistical impact on Blacks that the 1976 Q–35 assistant inspector's promotional examination displayed. Although the number of minority officers taking that exam was too small to establish a *prima facie* case of discrimination based on statistics alone, indications of discriminatory impact were serious enough to justify an injunction against its use in making permanent promotions to that rank.

Finally we offer the observation that during the course of this litigation, including the opening days of its trial that occurred before this settlement was reached, substantial evidence of intentional discrimination was presented to this court.

### Objections

■ A group of police officers currently holding the permanent rank of sergeant in the San Francisco Police Department have objected to the proposed consent decree and have moved to intervene in this lawsuit. They claim that the decree violates their rights under the San Francisco City Charter to have a lieutenant's promotional examination given every four years. They further claim that the decree deprives them of vested seniority rights and their rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and under 42 U.S.C. §§ 1981 and 1983. Although we have denied their application to intervene in this action, the objections and interests as third parties potentially affected by the operation of the proposed decree are relevant and necessary considerations in our decision

on whether to approve this settlement. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, at 371–76, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, at 837 (9th Cir. 1976).

■ The last lieutenant's exam was given in 1972, as the City on its own initiative chose not to administer another one during the pendency of this litigation. Under the terms of the proposed decree, the next lieutenant's exam will be given when all persons promoted from the 1976 sergeant's exam roster are eligible to take it. That may be as early as 1981, but it will be no later than July 1982. The sergeants protest further delay, especially in light of the fact that the decree imposes no delay on sergeant's and captain's promotional exams. The sergeants also protest the impact of the proposed settlement remedies on their seniority rights. The present seniority system provides that up to 15 percent of a candidate's competitive standing on promotional exams may be derived from seniority credits. On the sergeant's exam, one percent for every year of service within the department is counted, up to a maximum of 15 years (15 percent). On the lieutenant's exam, 0.6 percent of every year of departmental service is counted, up to a maximum of 15 years (9 percent), and 0.6 percent for every year of service as a sergeant is counted, up to a maximum of 10 years (6 percent). On the captain's exam, 0.45 percent per year of service in the department, up to 20 years maximum (9 percent), and 0.6 percent per year of service as a lieutenant, up to 10 years maximum (6 percent), is counted.[1] To be eligible to take an exam, an applicant must have completed a probationary period in the rank immediately below that to which he is applying—one year as a patrol officer and six months in upper ranks.

---

1. Therefore, since the last sergeant's exam from which permanent appointments were made was given in 1971, and since the last such appointments were made in 1974, all present sergeants would qualify for at least 11 years of service credit (6.6 percent) and 7 years of in-rank credit (4.2 percent) if the next lieutenant's exam were given in 1981. Many would have

the maximum allowable credit for departmental service time (15 years—9 percent), and a significant number (e. g., approximately 33 of the 111 sergeants seeking intervention. Joinder of Individual Sergeants in Motion to Intervene, March 15, 1979.) would have maximum in-rank credit (10 years—6 percent).

This contrasts with the promotion system prescribed in the proposed consent decree. For the first five years under the decree, no seniority credits shall be granted on promotional exams. Thereafter, for the remaining five years of the decree, the City may grant seniority credit counting up to five percent of a candidate's competitive standing for promotion. Candidates may be granted one and two-thirds percent credit for each year served in the rank from which promotion is sought. Hence a maximum of three years of service in rank may be counted. The decree also provides that officers must spend more time in rank before being eligible to take a promotion exam than is required under the present system. Applicants for promotion to the ranks of sergeant and assistant inspector must serve three years in the department to be eligible to take those exams. Applicants for promotion to lieutenant and captain must serve two years as sergeants and lieutenants, respectively, to be eligible for those exams.[2]

In response to these objections, we initially emphasize that the proposed decree is a negotiated settlement agreement that includes compromises and concessions made by every party to this litigation. Each no doubt hoped that a full trial on the merits of this case would have produced results or relief more favorable to its interests, but each was willing to forego the chance of achieving complete success in exchange for the less favorable but guaranteed provisions of the consent decree. Similarly, by settling this case out of court, each party avoided the risk that full trial might have yielded results much more adverse to its interests. Each party also avoided the high costs in time, money, and unavoidable divisiveness and bitterness that would have resulted from pursuing the trial to its distant conclusion. These are the very reasons that settlements are favored by courts generally and especially in the Title VII context. See, e. g., EEOC v. American Telephone & Telegraph Co., 419 F.Supp. 1022 (E.D.Pa.

1976), aff'd, 556 F.2d 167 (3d Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).

The prejudice to their interests that the sergeants perceive must be viewed with these considerations in mind. One of the plaintiffs' essential complaints in this action, based on obvious facts, is the absence of minorities from the upper ranks of the San Francisco Police Department. Delaying the next lieutenant's exam responds to this issue by assuring that significant numbers of minorities are eligible to take the exam when next given. The temporary modification to the system of granting seniority credits on promotional exams assures that these minorities will be able to compete for the promotions on an equal footing with other officers.

Admittedly the sergeants are disadvantaged by these features of the decree. However, the further delay of the next lieutenant's exam would be no greater than the time required for full trial and appeal. Furthermore, the record in this case already includes sufficient evidence to establish findings of discrimination that would support the imposition by this court of quotas or references. Such drastic and intrusive remedies would certainly be more prejudicial to the sergeants' interests than the temporary elimination of promotional exam seniority credits. Moreover, many of the sergeants now protesting this abridgement of seniority rights earned their promotion to sergeant and their subsequently accrued in-rank seniority on the basis of the 1971 Q–50 sergeant's exam, which has been previously adjudged by this court to violate federal antidiscrimination laws. Memorandum and Order, Sept. 22, 1978. That is, their seniority was earned at the direct expense of the victims of the illegal, discriminatory effects of that exam. Such continuing effects of discrimination would be a further basis for court-imposed affirmative relief. Hence the seniority system

---

**2.** A one-time exception is made for officers promoted from the 1976 sergeant's exam roster. They need serve only 18 months as sergeants before being eligible to take a lieutenant's exam.

modification and the delayed lieutenant's exam scheduling cannot be found to be unfair or unreasonable compromises.

■ It is also very significant that this decree was negotiated by representatives of the San Francisco Police Officers Association (POA), in which the objecting sergeants are members. Its elected Board of Directors recommended the approval of the agreement, and its membership approved the agreement by a 76 percent majority. The POA is a certified collective bargaining agent for the police officers of San Francisco, and it recently negotiated with the Police Department a Memorandum of Understanding that has the force of a collective bargaining contract in California. *Glendale City Employees Association v. City of Glendale*, 115 C.3d 328 (1975). The seniority rights claimed by the sergeants are not constitutionally protected vested property rights as they would suggest, *EEOC v. American Telephone & Telegraph Co.*, 419 F.Supp. 1022, 1037 (E.D.Pa.1976), *aff'd*, 556 F.2d 167 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978), and it is clear that a union may in good faith amend seniority provisions in a collective bargaining agreement in carrying out its duties of representation. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). This is precisely what has occurred in this case. In the face of litigation that offered the possibility of much more drastic remedies in this area, in hopes of facilitating the advancement of minorities to the upper ranks of the San Francisco Police Department, the POA exercised its sound discretion and its proper authority to negotiate with the City a temporary change in promotion procedures. Thus the POA's negotiation and approval of this agreement weighs very heavily against the objections of the sergeants, not only because the POA, as the union and the collective bargaining agent of these officers, agreed to it, but also because the POA so competently and vigorously represented these sergeants and defended their promotional rights and opportunities throughout this litigation. The factual bases for this conclusion are discussed in more detail in our accompanying order denying the sergeants' motion to intervene in this lawsuit. In summary, in strenuously opposing and helping to defeat a proposed settlement last spring because of its adverse impact on its members' interests and in consistently asserting the promotional interests, of its members in proceedings before this court, the POA has convincingly demonstrated its commitment to its sergeants. The fact that the POA accepted this proposed consent decree is a persuasive argument that the decree represents a fair and reasonable end to this litigation for these sergeants and other incumbent police officers.[3]

3. The POA's consent to this proposed decree also distinguishes this case from *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), urged by the sergeants as a bar to the relief provided in the decree. *Teamsters* involved fully litigated court-imposed affirmative relief, in the form of grants of constructive retroactive seniority credits to discriminatees. The defendant union strenuously opposed that remedy and appealed. But since the case at bar involves a consensual settlement with remedies agreed to by all parties, including the POA in its status as the collective bargaining agent and an adequate representative of the sergeants, the *Teamsters* limitation on court-imposed remedies would appear not to apply.

Furthermore, though we need not and do not decide the question, it appears to us doubtful that *Teamsters* would necessarily apply to the type of remedies set out in this decree anyway. Although incumbent sergeants here lose seniority credit advantages on promotional exams which they would have enjoyed under the present system, the decree nonetheless gives minorities no actual advantages over incumbents as did the granting of retroactive seniority credit in *Teamsters*. That is, though seniority rights are prejudiced in that all promotion applicants are equalized, there is no literal preference given to victims of discrimination.

Finally, *Teamsters* may also be inapplicable for the reason that the present seniority-based promotion system has been challenged by the plaintiffs as having been conceived and implemented with a discriminatory purpose. Hence it would not be a bona fide seniority system immunized under section 703(h) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), as was the system at issue in *Teamsters*.

Finally, in reply to the claims of the sergeants that the decree discriminates against them on the basis of race, we again note that the decree includes no racial quotas or preferences. Achievement of goals prescribed by the decree is subject to the availability of qualified applicants. The modification of the seniority system impacts equally on all officers, minority and nonminority alike. Indeed, the thrust of this settlement agreement emphasizes equal opportunity in the future, not redress for past wrongs. We cannot agree with these objectors that the decree illegally or inequitably discriminates against them, nor that the balance it strikes among competing interests is anything but fair, just and reasonable.

■ Also objecting to the proposed decree is Jesse Byrd, a named plaintiff in this action and former president of Officers for Justice. He protests the mitigation requirements of the back pay provisions of the decree as they particularly apply to him as a member of the solo motorcycle detail. He has been receiving a hazard pay differential for this duty, which will be offset against the back pay award for which he may be eligible as a sergeant applicant discriminatee. The assignments for sergeants in the department are such that it is very unlikely that Officer Byrd would have received hazard pay if he had served as a sergeant during the relevant period. Hence he would not have received both the salary increment for being a sergeant and a hazard pay differential during this period. Although Officer Byrd may feel that hazard pay is different in kind from the additional salary he would have earned as a sergeant, this court finds the mitigation provision and its effect on Officer Byrd to be a fair resolution of this issue.

Officer Byrd further contends that the maximum back pay awards allowed by the decree are inadequate, that no compensation to any individual has been included for damages caused by intentional discrimination, and that the promotion, recruitment, and training relief provided in the decree are too limited. In response we again emphasize the costs and risks of litigation and the desirability of settlement to achieve a resolution that all parties can accept. It is possible that after a fully litigated finding of liability, this court might have imposed remedies of the kind suggested, but the delay alone before such measures might be effected would dilute them considerably. In any case, though we are appreciative of Officer Byrd's position and his sentiments as an alleged victim of discrimination and one of the initiators of this lawsuit, we are of the opinion that this decree offers meaningful and adequate remedies for the effects of past discrimination, effective procedures for the prevention of future discrimination, and a legal and equitable disposition of this dispute.

■ The final objection submitted to this court concerns the possibility that the departmental age requirements may bar successful reapplication by some individuals discriminated against by past entry exams. Although such discriminatees might be eligible for back pay awards under the decree, no specific relief in the form of employment is ordered. They may of course reapply, but admittedly the age requirements in the City Charter may now disqualify some. We note the adverse impact on this objector and others similarly situated, but this objector has not challenged the legality of these requirements, and such a determination is beyond the scope of the instant action. We find that the back pay awards and recruitment goals and future entry opportunities for minorities provided by the decree are most adequate.

Having considered the objections to the proposed consent decree, the interests of those affected by it, the record of this case, and relevant legal and equitable principles, we conclude that this decree is deserving of our approval. It presents a just, fair and reasonable resolution of this action that offers adequate relief to the victims of past discrimination without unduly burdening innocent third parties, but most importantly, it assures the future integration of the

San Francisco Police Department by providing equal and meaningful ópportunities for the entry and advancement of minorities and women.

IT IS SO ORDERED.

## APPENDIX

### CONSENT DECREE

The plaintiffs Officers for Justice, et al., filed their Complaint in this action on April 23, 1973 (amended on June 30, 1977), against the Civil Service Commission of the City and County of San Francisco, alleging that the defendants are engaged in a pattern or practice of discrimination in employment on the basis of race, sex and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972 (Pub.L. 92–261, March 24, 1972); 42 U.S.C. Section 1981 and 42 U.S.C. Section 1983. The plaintiffs have, during the course of this litigation, introduced substantial evidence of intentional discrimination by the defendants. This Court has issued preliminary orders finding the defendants' selection practices and procedures for entry-level and Sergeant positions to be discriminatory and in violation of federal law. These decisions are to be found at 371 F.Supp. 1328 (N.D.Cal. 1973), 395 F.Supp. 378 (N.D.Cal.1975), 14 EPD 7548 (N.D.Cal.1977), and 14 EPD 7549 (N.D.Cal.1977), and, further the Court on September 22, 1978 granted plaintiff United States partial Summary Judgment with respect to certain of defendants' examination procedures.

No findings of any kind have been issued by the Court concerning the validity of the 1974 audio-visual entry-level selection device. Defendants, by entering into this Consent Decree, do not admit thereby that said examination in any way violates federal law, rule or regulation.

Prior to a final hearing on the merits of this litigation, the plaintiff United States of America filed its Complaint against the City and County of San Francisco, alleging that the defendants are engaged in a pattern or practice of discrimination in employment on the basis of race, sex and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e, et seq., as amended by the Equal Employment Opportunity Act of 1972 (Pub.L. 92–261, March 24, 1972), the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. Section 3701, as amended, and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. Sections 1221, et seq. The two cases have been consolidated.

The parties wish to avoid the delay and expense of contested litigation and desire to insure that any disadvantage to minorities and females that may have resulted from past hiring and promotional practices be remedied so that equal employment opportunity will be provided to all.

The Court has jurisdiction over the parties and subject matter of this action.

The parties, by agreeing to the issuance of this order, waive a hearing and findings of fact and conclusions of law on all issues raised by the complaints, and the parties have mutually agreed to the entry of this Consent Decree. Defendants, by entering into this Consent Decree, do not thereby admit any violations of law, rule or regulation with respect to the allegations made by plaintiffs, private or governmental, in their complaints. By entering into this Consent Decree, defendants do not concede the legal and constitutional validity of the Court's findings of discrimination. Defendants admit to no failure to practice affirmative action.

The Court having been fully advised and informed of the facts and circumstances, and good cause appearing therefor,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### I

### EFFECT OF THE CONSENT DECREE

This Decree is entered into as a settlement of an existing dispute between plain-

tiffs, both private and governmental, and defendants as to appropriate and valid procedures for the hiring and promotion of police officers for the City and County of San Francisco. It also provides for specific, definable and good faith efforts to be made by defendants to achieve certain goals for employment of women and minorities as herein defined, within specified periods of time. This Consent Decree satisfies and resolves all claims of the private plaintiffs and the class they represent, and of plaintiff United States, of racial, ethnic, national origin and sex discrimination with respect to those matters set forth in the complaints and the previous orders of this Court.

This Decree also enjoins the Law Enforcement Assistance Administration from suspending financial assistance to the San Francisco Police Department pursuant to 42 U.S.C. Section 3766(c)(2)(E) and the Complaint filed by the United States of America on December 22, 1977.

Both private plaintiffs and the class they represent, and plaintiff United States, shall seek no further relief for the acts, practices or omissions alleged in the complaints save to enforce the provisions of this Decree, thereby waiving the right to seek further relief.

Plaintiffs, both private and governmental, agree that this Consent Decree is fully binding individually and on the class they represent. Defendants agree that this Consent Decree is fully binding on each of them, each of their officers, agents, employees and successors, and all other persons acting in concert with them who have notice of this Decree.

## II

### DEFINITIONS

For the purposes of this Consent Decree, the following terms shall be defined as follows:

"Plaintiffs"—The named parties plaintiff of both *Officers for Justice, et al. v. Civil Service Commission, et al.*, No. C–73–0657

RFP and the class they represent, and *United States of America v. The City and County of San Francisco*, No. C–77–2884 RFP.

"Defendants" or "City"—The named parties defendant in both of the above-referenced actions, except for intervenor Police Officers Association.

"Minorities"—For purposes of this Decree, the term "minority" shall include only those persons within the groups "Black", "Hispanic" and "Asian or Pacific Area people" as defined at 28 C.F.R. 42.402(e).

"Private Organizational Plaintiffs"—The named organizational plaintiffs of *Officers for Justice, et al. v. Civil Service Commission, et al.*, specifically the Officers for Justice, the National Organization for Women, Chinese for Affirmative Action, the League of United Latin American Citizens, and the National Association for the Advancement of Colored People.

"Parties"—The "plaintiffs" and "defendants" as defined above, and defendant-intervenor Police Officers Association.

## III

### CLASS CERTIFICATION

Plaintiffs brought this action as a class action seeking to represent various categories of persons for purposes of securing injunctive and declaratory relief, as well as for the recovery of back pay, compensatory and punitive damages. In its order of May 12, 1977, the Court certified the plaintiff class for purposes of injunctive and declaratory relief. For purposes of this Decree, the Court hereby adopts the class description set forth in that order with modifications as follows:

There shall be two plaintiff subclasses. Subclass (a) shall consist of all Blacks, Hispanics, and Asians (including Chinese, Filipinos, Japanese, Korean and other Pacific Area people), who:

(a) completed the entry level Q–2 or Q–20 examination administered by defendants during the years 1969–72, but failed or placed so low that there was no likelihood of their permanent

appointment, or who were disqualified because of height;

(b) applied for the 1974 Q–2 examination, but were discouraged or dissuaded from completing the examination process as a result of alleged discriminatory practices of defendants;

(c) completed the 1974 Q–2 examination, .but failed or placed so low that there is no likelihood of their permanent appointment;

(d) have been discriminated against in any temporary or permanent promotions or other benefits by their lack of seniority in the police department which is the cumulative effect of discrimination at the entry level;

(e) completed the 1971 Q–50, or 1972 Q–35 promotional examinations, but failed or placed so low that they did not receive appointment;

(f) failed the 1976 Q–35 or Q–50 promotional examinations, or would not have received appointment but for the provisions of this Decree in paragraph 10(a);

Subclass (b) shall be all women who:

(a) took the last Q–20 examination and did not receive appointment from the eligible list;

(b) applied for the 1974 Q–2 examination, but were discouraged or dissuaded from completing the examination process as a result of discriminatory practices of defendants;

(c) completed the 1974 Q–2 written examination, but did not complete the process or were disqualified on the basis of the physical agility examination;

(d) were appointed to the position of Q–2 patrol officer as a result of this Court's order of May 5, 1975, 395 F.Supp. 378;

(e) were Q–20 policewomen who were precluded, because of their sex, from eligibility for the Q–50 examination process until 1976.

This action was brought, insofar as is relevant to this section of the Decree, on the basis of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e *et seq.*, as amended, and 42 U.S.C. Sections 1981, 1983. For purposes of this settlement alone, and for no other purposes, the Court is satisfied that the above class should be and hereby is certified as proper under Federal Rule of Civil Procedure 23(b)(2) for injunctive, declaratory and back pay relief, and under Federal Rule of Civil Procedure 23(b)(3) for purposes of recovery of compensatory or punitive damages, if any.

## IV

## GENERAL

1. Defendants are compelled by law and by entering into this Consent Decree acknowledge their obligation to, and agree that they shall, refrain from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the San Francisco Police Department because of such individual's race, sex or national origin. Defendants in addition acknowledge their duty under law to, and agree that they shall, refrain from discriminating at any time on the basis of race, sex or national origin in hiring, promotion, upgrading, training, assignment or discharge or otherwise discriminating against an individual employee or applicant for employment with respect to compensation, terms and conditions or privileges of employment because of such individual's race, sex or national origin. The City shall take reasonable steps to assure that no member of the police department interferes with the enforcement of this Decree by any means, including the harassment or intimidation of minority or female officers protected by the terms of this Decree. The acknowledgments set forth in this paragraph do not create a right or rights in any person or group of persons to seek relief under this Decree for defendants' failure to comply

with their general legal obligations as described in this paragraph, except for conduct which constitutes a pattern or practice of unlawful discrimination on the basis of race, sex or national origin.

2. In the event the entry of this Consent Decree generates, either through intervention or separate, collateral lawsuits, attacks on the appropriateness or sufficiency of any of the provisions contained herein, to include actions claiming entitlement to damages against the City as a result of the ordering of any of the affirmative relief contained in this Decree, the parties hereto agree and warrant that they shall defend the lawfulness of any provision or provisions so attacked. If any such collateral lawsuit arises in state court against the City, it shall seek to remove such action to the Federal District Court.

V

RECRUITMENT

3. The City shall continue to develop and reassess its present affirmative recruitment program designed to inform minorities and women of job opportunities with the San Francisco Police Department. The City is obligated to engage in such recruitment practices as may be reasonably necessary to attract sufficient qualified minorities and women to meet the goals set forth in paragraph 9a below. Specific recruitment programs shall be designed with the participation and support of the parties, as specified in paragraph 11 below. The recruitment program shall include contacts with area high schools, technical and vocational schools, colleges, and organizations which have traditionally expressed an interest in providing minority and female applicants or which indicate such interest in the future, and informing them of employment opportunities for City residents. In addition, where appropriate, advertising of employment opportunities shall be placed in radio stations and other mass media primarily directed to Black, Hispanic, Asian and female audiences for the purpose of emphasizing to minorities and women the availability of employment positions.

VI

SELECTION PROCEDURES

4. The City shall, except as provided herein, make no further use of tests or other selection qualifications, standards or procedures for hiring or promotion within the San Francisco Police Department the use of which has been enjoined by previous orders of this Court, or any tests, qualifications, standards or other procedures within said Department which have a disproportionately adverse impact against minorities or females, unless and until such standards have been shown to be valid, pursuant to the *Uniform Guidelines on Employee Selection Procedures*, 43 Fed.Reg. 38290, August 25, 1978, or any superceding federal guidelines. All evidence of validity of proposed tests, standards or selection procedures to be used subsequent to .the entry of this Decree shall be submitted to the parties' counsel for review and comment at least sixty days prior to their implementation. In order to meet the hiring goals for females set forth in paragraph 9 below, the City will establish physical agility scores utilizing the same T-score for women vis-a-vis women as the T-score for men vis-a-vis men. The City shall establish eligibility lists on the basis of examinations, and make selections from those lists, in a manner consistent with its obligation to expedite and facilitate the achievement of all goals set forth in this Decree.

5. The City shall require that all applicants for police officer be *bona fide* residents of the City and County of San Francisco at the time of their application and appointment, with residence thereafter to be maintained as required by City and State law.

6. The following written notice shall be given to all persons who take an examination for hiring or promotion within the department for the duration of this Decree:

This examination and the selection procedures to follow are the subject matter of a Consent Decree on behalf of minorities and women entered in the United States District Court for the Northern District of California and are matters which are subject to the scrutiny of that Court. The Consent Decree is on file and available for review at the Clerk's office of the Federal District Court, 450 Golden Gate Avenue, as Civil Actions No. C–73–657 RFP and No. 77–2884 RFP.

## VII

## ASSIGNMENT AND DISCIPLINE

7. The City is compelled by law, and by entering into this Consent Decree acknowledges its obligation to, and agrees that it shall, refrain from discriminating at any time on the basis of race, sex or national origin in assignments or discipline within the San Francisco Police Department. Disciplinary reporting shall be made as provided in paragraph 14g below and records of all assignments shall be made available to the auditor upon request, as herein provided. The acknowledgments set forth in this paragraph do not create a right or rights in any person or group of persons to seek relief under this Decree for defendants' failure to comply with their general legal obligations as described in this paragraph, except for conduct which constitutes a pattern or practice of unlawful discrimination on the basis of race, sex or national origin.

## VIII

## GOALS

8. In order to eradicate the present effects of past hiring and promotion practices with respect to minorities and women, the City shall adopt and seek to achieve as a long-term goal the recruitment, appointment and promotion of qualified minorities and women in sufficient numbers so as to increase substantially the minority and female composition of the San Francisco Police Department, so that it more nearly reflects the racial, ethnic and sexual composition of the relevant labor force of the City and County of San Francisco. For the purposes of this Decree, the long-term goal of defendants shall be to raise the minority representation to 45 percent of the sworn personnel of the San Francisco Police Department.

No specific numerical long term goal is set with respect to the representation of women on the sworn force, it being understood by the parties that equality with the qualified female labor force percentage may not be reached within the term of this Decree. The parties further understand that the interim goals for women established in paragraph 9 herein, while the only enforceable goals in this Decree for women, are minimum goals and it is expected that active and effective recruitment and training efforts by defendants may result in the appointment of significantly higher proportions of qualified female applicants. On attainment of the long term minority goal prior to expiration of this Decree and upon motion of defendants, the Court shall grant the City relief from compliance with the interim minority hiring procedures established in paragraph 9 hereof. All efforts, goals and objectives referred to herein require good faith effort on the part of the City.

9. *Hiring.*

The hiring objectives set forth herein are goals not quotas, and as such are subject to the availability of qualified applicants. Nothing herein shall be interpreted to require the hiring or promotion of unqualified persons, it being understood that the use of a selection procedure or examination shall not justify failure to meet a goal set out herein unless the procedure or examination is shown to be valid under the Uniform Guidelines on Employee Selection Procedures, *supra.*

a. To insure as quickly as practicable the attainment of its long-term goal, the City shall, subject to the availability of qualified minority and female applicants, adopt and seek to achieve the following interim objective:

In filling future vacancies at the entry level of the San Francisco Police Department, the City shall adopt and seek to achieve the goal of appointing sufficient minorities and women each year so that at least 50 percent of vacancies are filled by minorities and 20 percent of vacancies are filled by women, until the long-range goal of this Decree has been achieved, or until the expiration of this Decree, whichever occurs first. Minority women shall be considered to satisfy both the minority and female goals above. For purposes of eligibility list E–91 only, the goal for females shall be 20 percent of available vacancies plus 30 women over the life of said list, with the goal to revert to 20 percent for all lists thereafter during the pendency of this Decree.

b. Because there may be persons within the City and County of San Francisco who are disadvantaged by an English language disability, especially in the Chinese community, the City agrees to adopt and seek to achieve as a long-term objective the appointment of persons bilingual in Chinese to the department so that the proportion of officers bilingual in Chinese in the San Francisco Police Department more nearly reflects the proportion of non-English speaking Chinese persons in the City's total population. In addition, the agreement entered into between the San Francisco Police Department and the Law Enforcement Assistance Administration on December 28, 1977, to resolve a preliminary finding of noncompliance with the Safe Streets Act issued by LEAA on November 16, 1977, is attached hereto as Exhibit A and incorporated herein by reference. The City shall undertake a special recruitment and hiring program, the objective of which will be specifically to secure bilingual Chinese-speaking officers for appointment to the department.

Pursuant to this requirement, the City shall adopt and seek to achieve a goal of appointing from the next Q–2 eligible list adopted after May, 1979, nine officers bilingual in Chinese, subject to their availability on said eligible list. In the event any of the nine persons so appointed are minorities, they shall not be counted to satisfy the goals to which the City agrees in paragraph 9(a) above. In addition, the City shall adopt and seek to achieve a goal of appointing twenty officers bilingual in Chinese, subject to the availability of such persons, by January 1, 1984, from available Q–2 eligible lists. The City agrees at all times during the period of this Decree to be responsive to the need for bilingual police officers beyond that set forth in this Consent Decree and bi-annually assess the delivery of police services to the minority, language-disadvantaged communities of San Francisco.

c. Only those persons who successfully complete the academy and field training programs shall be counted for purposes of determining compliance with the goals set forth in paragraph 9a above. For the purposes of this Decree, the academy and field training program shall be deemed to be eight months in duration.

10. *Promotion.* To insure as quickly as practicable the attainment of its long-range promotional goals, the City agrees to the following:

a. *Sergeant and Assistant Inspector*:

(1) The City agrees that it shall by August 1, 1981, increase the number of sworn officers in the San Francisco Police Department to the full budgeted strength of 1971 persons, and shall maintain at least that level of staffing until at least August 1, 1984.

(2) The department will by January 1, 1981, offer promotion to the ranks of Sergeant or Assistant Inspector to all officers in rank order on the respective 1976 informational rosters of candidates eligible for promotion to those positions. Those persons holding temporary appointments to those ranks as of December 1, 1978, shall be retained in said status until their permanent appointment. Seniority shall accrue in rank order to persons appointed pursuant to this provision as of the date of permanent appointment.

(3) After appointments to Sergeant or Assistant Inspector in accordance with subparagraph 10a(2) above, the City shall, subject to the availability of qualified minority and female applicants, adopt and seek to achieve an annual goal of selecting minorities and women for promotion to permanent Sergeant and Assistant Inspector positions in proportion to their representation in the qualified applicant pool for each examination.

(4) In view of the fact that the rate of appointments in the past ten years for the rank of Sergeant has been twenty-five persons annually and fifteen persons annually for the rank of Assistant Inspector, the City shall maintain at least this rate of appointment in said ranks from and after August 1, 1981, through the termination date of this decree.

b. *Lieutenant and Captain* :

(1) The City will administer the next Lieutenant examination when all the minorities and women promoted to Sergeant in accordance with paragraph 10a(2) above are eligible to compete for promotion to Lieutenant.

(2) Subject to the availability of qualified minority and female candidates, the City shall adopt and seek to achieve the annual goal of selecting minorities and women for promotion to Lieutenant and Captain in proportion to their representation in the qualified applicant pool for each examination.

(3) The City shall limit to two years the life of the eligibility lists for the next two Captain examinations administered following entry of this Decree.

(4) The City shall conduct an extensive review of the selection procedures for the positions of Lieutenant and Captain to ensure their job relatedness and to attempt to minimize or eliminate adverse impact on minorities and women.

(5) At least 120 days in advance of the administration of each examination for Lieutenant and Captain, the City shall notify counsel for the parties of the nature and scope of the anticipated examination, the procedure by which it was developed, and expected means of scoring and ranking applicants. Thereafter, the City shall notify counsel for the parties of the results, by race, sex and national origin, for each stage of the examination process within ten days of its administration if practicable and at least 60 days before any eligibility list is formally adopted. If any of the parties wish to object to the examination process or any portion thereof, they shall notify the other parties in writing within 30 days of the receipt of the information set forth above of the nature of the objections and the parties shall meet promptly to attempt to resolve the objection. Failing resolution in this manner, any party may move the Court for resolution.

(6) In view of the fact that the rate of appointments in the past ten years for the ranks of Lieutenant and Captain have averaged on an annual basis no less than twelve persons and four persons respectively, the City shall appoint between August 1, 1985 and the termination date of this decree in the aggregate forty-eight persons to the rank of Lieutenant and sixteen persons to the rank of Captain. This commitment shall be measured over this four-year period and not on an annual or other basis.

c. *Nonpermanent Appointments.* In the absence of civil service eligible lists, future nonpermanent appointments from the next lower rank in the uniformed force shall be based on experience (which may include seniority), demonstrated performance, and potential to fulfill the requirements of the position to which the appointee will be assigned but shall be made without regard to seniority as a sole criterion and, consistent with the foregoing, reasonable efforts shall be made to give leadership experience to minorities and women.

d. In order for the City to construct promotional examinations that appropriately sample the knowledges, skills and abilities essential to the particular promotive rank or position, said examinations need not

be entirely of a written character, nor shall test content be necessarily related to material taken from a bibliography promulgated within the police department at least six months prior to the administration of the examination, and the examination components shall be weighted as is appropriate to the rank or position for which the examination is held. Said examinations shall consist of a combination of written and oral components, and shall be job-related.

No service credits on promotional examinations or other service requirements as a prerequisite to competing in said examinations during the pendency of this Decree shall be granted or imposed, except as follows:

(1) Any sworn member of the police department who has served in the department not less than three years shall be eligible to participate in a competitive examination for either the rank of Sergeant or Assistant Inspector.

(2) a. Any sworn member of the police department who has held a permanent appointment in the rank of Sergeant for not less than two years shall be eligible to participate in a competitive examination for the rank of Lieutenant.

b. On a one-time only basis, those persons promoted to Sergeant pursuant to paragraph 10a(2) above shall be eligible to participate in a competitive examination for the rank of Lieutenant after holding a permanent appointment in the rank of Sergeant. for not less than eighteen months. This exception does not and will not apply to any other persons nor to any other examinations for Lieutenant save for that referred to in paragraph 10b(1) above.

(3) Any sworn member of the police department who has held a permanent appointment in the rank of Lieutenant for not less than two years shall be eligible to participate in a compet-

itive examination for the rank of Captain.

(4) Five years after the entry of this Consent Decree, the City may adopt a policy of giving service credits to applicants for promotion, worth up to a maximum of five percent of a candidate's standing in the competitive process, by allowing one and two-thirds percent credit in the process as a whole for each year that a candidate has held a permanent appointment in the rank from which promotion is to be made up to a maximum of three years per candidate.

The Chief of Police shall have power, subject to the approval of the Police Commission, to appoint any sworn member holding a permanent appointment in the rank of Lieutenant or above to any non-civil service rank as created by the Police Commission pursuant to the provision of Charter Section 3.530.

## IX

## SPECIFIC RELIEF

11. *Recruitment, Training and Promotion of Minorities and Women.*

a. In order to achieve the goals set forth herein, the City shall develop a full scale program specifically designed to recruit and train minorities and women for hiring, and prepare them for promotion, in the Police Department. This program shall be consistent with the recruitment program approved and ordered by the Court on November 21, 1978. The program shall contain both a specific and comprehensive two year plan and at least a specific outline of a long-range plan. The program shall include steps designed to ensure that the parties are fully involved at all levels of planning. The program shall also designate specific roles for active participation by the parties. Each program will include participation of qualified persons, including the parties wherever possible and appropriate. In devising this program, the City shall take into account the important role that minorities

and women, and minority and women's organizations, must play in implementing the program and ensuring that the goals set forth in this Decree are fully met.

b. The Defendants shall adopt a program for the development of Chinese bilingual skills. It shall be administered by entities independent of the Police or Civil Service Commissions, subject to approval of the Auditor-Monitor, and the parties and shall be subject to appropriate audits. Available funds shall be used to train officers, without regard to race, in at least some language skills in Chinese, and to upgrade the skills of those who already speak some Chinese.

12. *Auditor-Monitor*: The Defendants shall assume reasonable costs, including salary, fringe benefits, para-professional and secretary services, office space, duplicating, travel, postage and other related costs, for an Auditor-Monitor, regarding compliance with this Decree. The Auditor-Monitor, hereinafter Auditor, shall be employed as is necessary to discharge fully and expeditiously the duties set forth herein until termination of this Decree. The Auditor's duties shall include but not be limited to:

a. Preparing the reports to the Court and the parties required by paragraph 14 below;

b. Administering the $500,000.00 Fund, described in paragraph 13 below, in order to ensure that recruitment, training, testing and promotions are proceeding in an appropriate fashion consistent with the goals and objectives of this Decree;

c. Assuring that assignments and disciplinary proceedings are free of discrimination on the basis of race, sex or national origin;

d. Making a determination of the race or national origin of candidates for appointment in accordance with the definitions adopted in Part II of this Decree, subject to objection by the parties hereto;

e. Verifying that all data submitted by the City to the parties and the Court pursuant to this Decree are complete and accurate. Pursuant thereto, the Auditor shall have full and complete access to all data available to the City regarding the above matter and shall have the right to make appropriate requests for the gathering and compilation of additional data necessary to accomplish the goals and objectives of this Decree. The Auditor shall also have full and complete access to all personnel who could be helpful in effectuating the goals and objectives set forth herein; and,

f. Any and all documents, records or other material submitted to the Auditor as provided herein subject to a claim of privilege under state or federal law shall be deemed confidential and treated as such by the Auditor and shall not be subject to public disclosure absent an order of the Court.

The Auditor, after consultation with the parties and subject to approval of the parties to this Decree, shall review and approve the City's plans to achieve the goals and objectives set forth in this Decree. With continuing appropriate consultation with said parties, the Auditor shall determine those recruitment, testing, professional upgrading, leadership and promotional programs to be implemented from the Fund, and give financial approval to those programs. Such programs shall be solicited from the City and the other parties and other qualified organizations. Any unresolved disputes between the Auditor and said parties shall be submitted, upon appropriate notice, to the Court for resolution. The Auditor shall submit quarterly reports to the Court and said parties regarding the nature and amount of funds disbursed from the $500,000.00 Fund.

The experience and professional stature of the Auditor shall be commensurate with these duties, as shall be his or her salary. The Auditor shall be selected by the Court from among persons jointly recommended by the parties to this Decree or by the Court itself subject to approval of the parties to this Decree.

### 13. *Monetary Relief*:

The parties to this Decree have agreed that the aggregate monetary relief in this case shall be $900,000, $400,000 of which shall go for back pay and other damages as set forth in paragraph 13(b) below. The remainder of this sum ($500,000) shall be deposited with the Treasurer of the City and County of San Francisco within 45 days of final approval of the Consent Decree in a special interest bearing account with interest accruing to the Fund, said sum to be used to fund the goals and objectives of this Decree. Primary use of this fund shall be for recruitment, testing, training, and professional upgrading and leadership opportunities for minorities and women. The purpose of this fund shall be to initiate programs as part of the City's obligation in this Decree, it being understood that the City has the continuing obligation to provide monies reasonably necessary to meet its responsibilities herein. Upon receipt of a voucher from the Auditor, the Controller of the City and County of San Francisco shall disperse from this Fund sums in accordance with the procedures set forth in paragraph 12. All disbursements shall be in accordance with generally accepted accounting principles, subject to audit, and shall be described in the quarterly reports to be submitted to the parties and the Court.

a. *Master.* Defendants shall assume reasonable costs, including salaries, fringe benefits, para-professional and secretarial services, office space, duplicating, travel, postage and other related costs for a master regarding distribution of the monetary relief under this Consent Decree. The master shall be selected with the approval of the Court from names jointly recommended by the parties to this Decree, or shall be selected independently by the Court. The master shall be employed as is necessary to discharge fully and expeditiously the duties set forth herein. The master shall review and approve a plan for the distribution of monetary relief to the class which shall be submitted by the parties to this Decree,

subject to final approval of the Court. The master shall also review and approve each individual claim for back pay, based upon an appropriate showing that the individual qualifies for receipt of monetary compensation under the proposed categories submitted by the parties to this Decree (Exhibit B), and shall distribute all payments to claimants. The master shall be provided any and all information necessary to review and approve the proposals submitted by the parties hereto, as well as to review and approve the individual claims submitted by class members.

b. *Monetary relief.* Subject to the provisions of paragraph 13(c) below, monetary relief under this Decree shall be distributed within the limits set forth below:

*Back Pay for Class Members*: The master shall be authorized to award to individual class members subject to proof in accordance with the standards set forth in the attached Exhibit B hereto up to $3,720 for back pay relief, which shall satisfy the entire claim of each individual class member against the Defendants, for back pay and any other damages under Title VII and 42 U.S.C. Sections 1981, 1983, and shall make claimant whole. There shall be a fund available for such distribution in the sum of $400,000, subject to the conditions in paragraph 23 below.

c. *Plan for Distribution.* Subject to the monetary limits set forth in paragraph 13(b) above, distribution of monetary relief shall be made by the master in accordance with qualification categories and monetary limitations set forth in Exhibit B hereto. With respect to Exhibit B categories 1(b) and 2(b), no person who qualifies for a payment in those subclasses shall in any event receive more than the maximum individual amount provided or a claimant's pro rata share of the fixed total amount shown on Exhibit B as allocated to that subclass, whichever is greater. With respect to the remaining subclasses, the total amount of money allocated for payment to each subclass shall be determined by the master upon joint recommendation of the parties to

this Decree after the number of claimants has been established so that the allocations among these subclasses results in the maximum proportionate recovery (subject to the established maximum individual limits) to the maximum number of claimants.

When the master is satisfied that after reasonable notice all possible outstanding claims have been made, any remaining funds which have not been distributed to any of the above designated parties shall revert to the fund described more fully in paragraph 13.

d. All persons making claim for monetary relief herein shall execute a release in the form attached as Exhibit C as a condition of payment.

## X

## REPORTING

14. Within thirty days of the entry of this Decree, and within thirty days of the last day of each calendar quarter for the duration of this Decree, the City shall submit to counsel for the parties a report or computer printout containing the following information:

a. A summary by race, national origin and sex of the number of persons in each rank at the end of the reporting period, including the number of such persons hired and/or promoted to such rank and leaving such rank during the reporting period voluntarily or involuntarily. The report filed thirty days after entry of the Decree need include only such a summary of persons in each rank as of the date of the Decree.

b. A list identifying all sworn members of the Police Department by name, rank and unit of the department, and (except for the first report) identifying all such persons who were either appointed or promoted during the quarterly reporting period together with their appointment or promotion date, and identifying those who during the quarterly reporting period voluntarily or involuntarily left the employment of the department and the reasons therefor.

c. A list of the persons certified for appointment, appointed, or promoted to each sworn position in the department in accordance with paragraphs 9 and 10 above, including each person's position on any eligibility list. With respect to applicants and new hires, the City shall make available to counsel for the United States upon request each person's home address and telephone number. Counsel for the United States agrees to keep such information confidential in accordance with the protective order previously entered in this litigation.

d. A list of individuals who failed to complete academy training, during the preceding quarter, including the reasons for the termination, voluntary or involuntary, of each such candidate.

e. A list of patrol officers who complete the probationary period, and for each probationary patrol officer who is dismissed or no longer a probationary officer, the reasons therefor.

f. A list of persons who applied for each sworn position in the department, identifying the person actually tested, the persons who passed each component of the examination and the scores reported for each component, and the persons who passed each complete examination.

Each list described in subparagraphs b through f above shall identify each individual by name, rank, social security number, race, sex, and national origin. The City shall also submit a copy of any computer tapes used to prepare the reports required by this paragraph 14, if requested by plaintiff United States.

g. A list of individuals against whom any disciplinary action was initiated by formal charge of the Chief of Police, the basis for such action, the persons actually disciplined, the disposition of each disciplinary action, and if sustained, the extent of the penalty or punishment.

15. The City shall provide counsel for the parties a copy of each eligibility list for hiring or promotion to any rank in the department at least thirty days in advance of the list's official posting or publication.

Each list so provided shall be identified by race, sex, and national origin.

## XI

### RECORD KEEPING

16. The City shall retain all records until further order of this Court relating to the recruitment, selection, appointment, promotion, training, assignment and discipline of persons for sworn officer positions in the Police Department, including:

a. all applications identified by race, sex and national origin;

b. all examinations administered including dates thereof and the scores of each applicant, identified by race, sex and national origin, on each component of the exam;

c. eligibility lists and appointments, identified by race, sex and national origin;

d. training and other employee evaluations.

Counsel for the parties shall have the right to inspect and/or copy for their use in connection with enforcement of this Decree any or all of the records described above, upon reasonable notice to the City subject to appropriate protective order. Counsel for the parties may request inspection or copying of other records for good cause shown upon application to the Court.

## XII

### MISCELLANEOUS

17. *Attorneys' Fees.* The City shall pay counsel for plaintiffs OFJ, et al., attorneys' fees in an amount no less than $238,700 and no more than $385,000 in settlement of all claims by said counsel for attorneys' fees from the commencement of this action through the expiration of this Decree, subject to the conditions in paragraph 23 below. The precise amount of the attorneys' fees to be paid shall be determined by the United States Magistrate after a hearing on the question. This amount shall be credited for any interim attorneys' fees ordered by the Court and paid by the City, with any interim fees to be paid within ninety days of the final approval of this Decree. These attorneys' fees shall also compensate counsel for plaintiffs OFJ, et al., for all work to be performed during the pendency of this Decree so long as the Court finds that the conduct of the City is in good faith.

18. If any provision of this Decree causes a result unintended by all the parties or an ambiguous interpretation, the aggrieved party shall notify the other parties by mail of the unintended result or ambiguous interpretation. The parties shall have 30 days after the date of such letter to resolve the problem. If the parties are unable to reach agreement within such 30 days, the issue may be submitted to the Court for resolution.

19. In the event any provision of this Decree is held unlawful by a court, all other provisions of this Decree shall remain in effect and only the rights and/or obligations established in the voided provision shall be extinguished.

20. This Decree shall continue in full force and effect for a period of ten years from and after the date of final approval hereof by the Court. The Decree shall terminate upon filing of an order of dismissal with prejudice by defendants at any time after the expiration of this ten year period, unless plaintiffs show good cause upon motion served and filed prior to termination why the Court's jurisdiction should be continued. During the effective period of this Decree, the Court shall have continuing jurisdiction for the purpose of effectuating the purposes and terms of said Decree and providing for the enforcement thereof.

21. The only obligations of this Decree are those explicitly stated herein.

22. Good faith efforts to comply with the provisions of this Decree are the standards of compliance for this Decree except where the law provides a higher standard.

23. In the event that upon final approval and entry of this Decree appeal is taken therefrom, the monies described in paragraphs 13(b) and 17 (except interim fees

awarded and paid) shall be deposited by defendants in an interest bearing special account with the Treasurer of the City and County of San Francisco, to be paid, together with accrued interest, only in the event of final resolution of the appeal upholding the provisions of this Decree supporting or justifying an award of attorneys' fees and/or monetary relief.

## XIII

## NOTICE

Notice of this Decree shall be provided to members of the class of plaintiffs in accordance with the Court's order of March 30, 1979.

Consent to the entry of the foregoing Decree is hereby made.

ROBERT L. GNAIZDA
LOIS SALISBURY
Public Advocates, Inc.

By _____
(s)      Robert L. Gnaizda

By _____
(s)      Lois Salisbury

OLIVER JONES
NAACP — Western Region

By _____
(s)      Oliver Jones

Attorneys for Plaintiffs

STEPHEN WARREN SOLOMON, INC.

By _____
(s)      Stephen Warren Solomon

By _____
(s)      Ralph B. Saltsman

Attorneys for Intervenor
Police Officers Association

GERALD F. GEORGE
MAIMON SCHWARZSCHILD
Attorneys
Department of Justice

By _____
(s)      Gerald F. George

By _____
(s)      Maimon Schwarzschild

Attorneys for United States

_____
(s)      George Agnost
City Attorney

_____
(s)      Michael C. Killelea
Deputy City Attorney

_____
(s)      Philip S. Ward
Deputy City Attorney

_____
(s)      Jerome A. DeFilippo
Deputy City Attorney

_____
(s)      Kenneth J. Harrington
Deputy City Attorney

Attorneys for Defendants

This Consent Decree is finally approved and its entry is ORDERED.

---

EXHIBIT "A"

UNITED STATES DEPARTMENT OF JUSTICE
LAW ENFORCEMENT ASSISTANCE ADMINISTRATION
WASHINGTON, D. C.   20531

Complaint No.: 77–C–104

In the Matter of:
The Office of Civil Rights Compliance
and
Chinese for Affirmative Action
Complainant
and
San Francisco Police Department
Respondent

## RESOLUTION AGREEMENT

In response to a complaint alleging that Respondent has failed to provide adequate service to the Chinese-speaking community of San Francisco, the LEAA

Office of Civil Rights Compliance (OCRC) has examined substantial evidence related to that claim. This evidence includes:

1. Data indicating that approximately half of the City's 65,000 Chinese-speaking residents do not speak English;

2. Police department employment figures showing that only five (5) of the department's 1,670 sworn personnel (0.3%) are bilingual (Chinese/English);

3. Interviews conducted with Chinese-speaking residents of the City, describing the adverse effect of Respondent's lack of bilingual (Chinese/English) officers on police service to the Chinese-speaking community;

4. Interviews conducted with police officers, including bilingual (Chinese/English) officers, all relating to the problems associated with making a timely and meaningful response to calls for assistance from the Chinese-speaking community.

LEAA has also found the Respondent willing to voluntarily resolve this matter in an equitable fashion. To that end, LEAA and Respondent hereby adopt the following terms of resolution:

1. It is understood by the parties that this Agreement does not constitute an admission by the Respondent of any violation of Section 518(c)(1) of the Crime Control Act of 1976.

2. The Respondent agrees to report in writing to the Director, OCRC, LEAA – U. S. Department of Justice, Washington, D. C. 20531, regarding how it is completing the undertaking outlined in the following paragraphs of this Agreement. This report shall be submitted not later than ninety (90) days from the date of this Agreement.

3. This Agreement does not address allegations of discrimination on the basis of race, sex, or national origin in Respondent's hiring and promotion practices. LEAA has asked the Civil Rights Division of the Department of Justice to assume primary responsibility for those issues.

4. The parties agree that service to the Chinese-speaking community can be improved by strengthening the Respondent's bilingual (Chinese/English) capability. To that end, the Respondent agrees to develop and maintain liaison with groups in the Chinese-speaking community, the public education secondary system in San Francisco proper, and selected colleges in the Bay Area in order to develop more effective methods of communicating department employment opportunities to Chinese-speaking students.

5. The Respondent will offer to upgrade the bilingual skills of present Chinese-speaking officers for the purpose of assigning them in the Chinese-speaking community. To that end the Respondent will cooperate with Chinese for Affirmative Action, other community groups and interested educational institutions for the purpose of improving the bilingual skills of Chinese-speaking officers. The Respondent agrees to count time spent by such officers in classes and training for this purpose as "on duty" time and shall pay the tuition and all other reasonable costs incurred by officers in connection with such training.

6. The Respondent agrees to continue to maintain an anti-extortion task force as was organized on September 4, 1977, the membership of which will include bilingual (Chinese/English) officers. The officers of the task force will make visits to Chinese-American businesses and attempt to create mutual confidence between members of the Chinese-speaking community and the department, seeking to improve the community's awareness of department activities. The task force's key objective will be to make reductions in the number of extortions in the Chinese-speaking business community, with particular emphasis on Chinatown and Richmond businesses. This unit's efforts shall be highly publicized.

7. The Respondent agrees to inform the Chinese-speaking community of the activities it is undertaking to protect and serve the Chinese-speaking community in particular. This information shall be disseminated via English and Chinese

language newspapers, and Chinese and English public service announcements on radio and television. These announcements shall encourage members of the Chinese-speaking community to participate in the publicized activities.

8. The Respondent agrees to inform in writing the Civil Service Commission of the City and County of San Francisco that:

   a. police services are a concern of San Francisco's Chinese-speaking community and,

   b. these concerns should be represented at interviews held by boards appointed by the Civil Service Commission for entry level positions (sworn and non-sworn) in the police department and,

   c. an effective means of achieving this goal would be the inclusion of Chinese-speaking members of San Francisco's Chinese-American community as members of or advisors to such boards.

9. The Respondent agrees that OCRC, on its own motion, may review compliance with this Agreement. As part of such review, OCRC may require written reports concerning compliance, may inspect the premises, examine witnesses, and examine and copy documents.

10. It is mutually agreed that this Agreement shall become effective as of the date all parties have signed below and shall remain in effect for two (2) years from said date. Respondent shall submit semi-annual reports for the periods ending June 30, 1978, December 31, 1978, June 30, 1979 and December 31, 1979. The reports will be due within thirty (30) days after these respective dates.

11. This Resolution Agreement shall terminate sixty (60) days after the Respondent files its last semi-annual report with OCRC in accordance with paragraph 10 above. OCRC may make a finding of non-compliance with the provisions of this Agreement at any time prior to sixty (60) days after the date Respondent submits its final report. Thereafter, OCRC shall have no further jurisdiction to make findings of non-compliance with this Resolution Agreement. If LEAA makes a determination of non-compliance with the terms of this Agreement, it shall institute administrative action pursuant to Section 518(c) of the Crime Control Act of 1976. LEAA may also, if appropriate, request the Civil Rights Division of the Department of Justice to take action to enforce Respondent's compliance with the terms of this Agreement.

12. The parties understand that this Agreement in no way restricts LEAA's authority or duty to take administrative action in connection with other issues of discrimination not addressed by this Agreement.

I have read the foregoing four (4) pages and I accept and agree to the provisions contained therein:

_____
(s) Charles R. Gain, Chief of Police
City and County of San Francisco
California

December 28, 1977
date

_____
(s) Lewis W. Taylor, Director Office
of Civil Rights Compliance LEAA –
DOJ

December 21, 1977
date

## EXHIBIT B

GUIDELINES FOR MASTER REGARD-
ING DISTRIBUTION OF MONE-
TARY RELIEF DESCRIBED IN
PARAGRAPH 13(b) OF THE CON-
SENT DECREE

I. GUIDELINES FOR DISTRIBUTION

The distribution of the monetary relief of this Consent Decree shall be administered by the Master according to the following guidelines:

(1) A party claiming recovery under any of the prescribed categories below may only seek recovery under one claim of eligibility, with the exception of those parties who, in collecting more than one claim will not recover more than $620. In no event shall any claimant for back-pay receive more than the maximum individual limit indicated below.

(2) For those sub-classes where a fixed total amount is designated, the Master shall make a pro-rata distribution, subject to that upper limit. In those categories where no fixed total is designated, the Master shall allocate payment so that allocation among these sub-classes results in the maximum proportionate individual recovery for the maximum number of claimants, subject to the maximum individual limit indicated.

(3) All claims for backpay and other relief are subject to standards of proof which have been agreed upon by the parties as set forth in part II, *infra.*, and shall be reviewed and applied by the Master to verify each individual claim.

### Backpay Relief For Class Members and Named Plaintiffs

| | | Maximum Individual Recovery | Fixed Total (If Designated) |
|---|---|---|---|
| 1. | Minorities | | |
| | a. Failed to secure permanent appointment to Sergeant (Q–50) as a result of taking the 1971 Q–50 exam, including those persons who were discouraged from taking the 1971 Q–50 examination as evidenced by at least two previously unsuccessful attempts to obtain a Q–50 position through examinations. | $3,720 | |
| | b. Completed written examination process for Q–2 from 1970 up to and including 1974 or took 1969 Q–20 and did not secure appointment, or were disqualified because of height. (Does not apply to those persons who were disqualified because of background, medical, or oral.) | $ 310 | $46,500 |
| | c. Minorities who completed the Q–35 written examination in 1972 and did not receive appointment. | $1,860 | |
| | d. Minorities who took and failed the 1976 Q–50 examination. | $ 620 | |
| | e. Minorities who took and failed the 1976 Q–35 examination. | $ 310 | |
| 2. | Women | | |
| | a. Women who took last Q–20 examination and did not receive appointment from the eligible list. | $1,860 | |

| | Maximum Individual Recovery | Fixed Total (If Designated) |
|---|---|---|
| **2. Women** | | |
| b. Women who passed the 1974 Q–2 written examination, but did not complete the process. | $ 310 | $46,500 |
| c. Women who were appointed from the 1974 Q–2 list to police officer positions and who reached their 21st birthday on or before December 31, 1972. | $1,860 | |
| d. Women who served as Q–20 policewomen and were precluded from taking the Sergeant's examination until 1976 and completed said examination, placing on the informational roster. | $3,720 | |
| e. Women who served as Q–20 policewomen and were precluded from taking the Sergeant's examination until 1976, and who entered the Police Department prior to January 1, 1970. | $3,720 | |

## II. GUIDELINES FOR PROOF OF CLAIMS

*Proof Guidelines For Distribution Under Part I*

### (1) *Proof Of Qualification*

With the cooperation of the defendants, the individuals shall document that they did take the examination described, and did or did not receive the appointment or promotion described. These matters shall be set forth in a declaration, which shall also include a statement verifying that the individual met the other minimal requirements for the position, including, where appropriate, residency, age and full duty status qualifications.

### (2) *Possible Mitigation*

The monetary distributions described in paragraphs 1(a), 1(d), 2(d) and 2(e) of this exhibit are based upon the presumption that the class member held a Q–2 or Q–20 position during the years 1970 to the present. In the event they held an assistant inspector or inspector's position or a position on the solo motorcycle detail for any of those years, or left the force, their claim shall be reduced proportionately for the years and differential involved.

## EXHIBIT C

### RELEASE

For and in consideration of the payment to the undersigned of the sum of _____ dollars, receipt of which said sum is hereby acknowledged, the undersigned hereby releases and discharges the City and County of San Francisco, all agents, employees, departments, commissions, commissioners and officers thereof of and from all action, causes of action, damages, claims and demands, made or which could have been made, in law or in equity, of every kind and character, including any and all claims for back pay, damages or other relief provided for under 42 U.S.C. Sections 1981 and 1983 and Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. Section 2000e, *et seq.*), which resulted from the hiring, promotional or other employment practices of the San Francisco Police Department, which was made the subject of litigation in the cases of *Officers for Justice v. Civil Service Commission*, U.S.D.C. No. C–73–0657 RFP and *U. S. A. v. City and County of San Francisco*, U.S.D.C. No. C–77–2884 RFP, and all damages heretofore sustained, or hereafter to be sustained by reason of said employ-

ment practices, and all claims arising out of said employment practices, whether known or unknown, suspected or unsuspected.

It is further understood that this settlement is a compromise of a disputed claim and that the payment is not to be construed as an admission of liability on the part of the City and County of San Francisco or any of its agents, employees, departments, commissions, commissioners or officers, by whom liability is expressly denied.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this _____ day of _____, 19____.

Witness: _____

_____

(Type or Print Name Under Signature)

---

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE OFFICERS FOR JUSTICE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE CIVIL SERVICE COMMISSION OF THE CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | No. C–73–0657 RFP |
| UNITED STATES OF AMERICA, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | No. C–77–2884 RFP <br> (Consolidated) |

---

## ON MOTION TO INTERVENE

This matter comes before the court on petitioners' motion for leave to intervene in this lawsuit pursuant to rules 24(a)(2) and 24(b)(2) of the Federal Rules of Civil Procedure. Petitioners are police officers holding the permanent rank of sergeant in the San Francisco Police Department. They claim that their seniority and civil rights are violated by a proposed settlement agreement that has been submitted by the parties for the court's approval. For the reasons set forth below, we deny their motion to intervene.

This action involves allegations of racial and sexual discrimination in the employment practices of the San Francisco Police Department. Plaintiffs include individual victims of discrimination and the class of persons they represent, several organizations representing minority groups in San Francisco, and the United States. Defendants are the City and County of San Francisco and several of its agencies. The San Francisco Police Officers Association (POA) was granted leave to intervene as a defendant shortly after the suit was filed in 1973.

On January 25, 1979, after almost six years of litigation that included several preliminary injunctions, a tentative settlement agreement that eventually collapsed, and the commencement of final trial on the merits, the parties presented to this court a proposed consent decree resolving all claims. All parties including the POA approved the settlement proposal. Notice of the proposed settlement was issued, and a hearing on the fairness of the proposal was set for March 5, 1979.

On February 28, 1979, the last day for submitting objections to the decree, petitioners filed statements with the court protesting that the proposal discriminated unfairly against sergeants in further delaying the next lieutenant's promotional exam, that it prejudiced their seniority rights, and that it violated their federal civil rights. On March 2, 1979, petitioners gave notice that they intended to move for leave to intervene in the action to seek modification of the proposed decree. Counsel for the petitioners appeared at the hearing · on March 5 and further argued their objections. The court heard arguments on the motion to intervene on March 15, 1979, and took the matter under submission.

Rule 24(a)(2) provides:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when an applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Thus the petitioners must satisfy this court in three respects: that they have a sufficient interest that will be adversely affected by the disposition of the action; that their application is timely; and that their interest is not adequately represented by existing parties to the action.

The proposed decree affects the scheduling of the next exam by which these sergeants may be promoted to lieutenant, and it modifies the present system of granting seniority credits on such exams. We shall assume, therefore, that petitioners have a sufficient interest.

In determining the timeliness of this motion to intervene, the court must consider a number of factors: the stage of the proceedings at which the motion is made, the prejudice to other parties in allowing intervention at that time, the reason for and the length of the delay, *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657 (9th Cir.), *cert. denied*, 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), the length of time that the applicants for intervention knew of and "slept on" their rights before acting, *see Alaniz v. California Processors, Inc.*, 73 F.R.D. 289, at 294 (N.D.Cal.1976), *aff'd*, 572 F.2d 657 (9th Cir.), *cert. denied*, 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), the purpose for which intervention is sought, and the necessity for intervention as a means of preserving the applicants' rights. *Commonwealth of Pennsylvania v. Rizzo*, 66 F.R.D. 598, 600 (E.D.Pa.1975), *aff'd*, 530 F.2d 501 (3d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976).

Petitioners claim that they first learned of the proposed consent decree during the first week of January, 1979, at meetings conducted by the leadership of the POA to explain the proposal to its membership. Petitioners admit that they had believed that the POA was adequately representing and protecting their interests until they learned of the decree and its adverse effects on them. They further claim that they first learned of their opportunity to object to the proposal in early February when formal notice of the proposed settlement was issued. They obtained counsel and filed objections as soon as possible thereafter.

Despite the exigencies pleaded by petitioners, the timing of their application can only be described as "eleventh hour." The lawsuit began six years ago, it was almost settled by the plaintiffs and the City nearly a year ago, and final trial on the merits

began months ago. Moreover, the trial was recessed in late November for the publicly expressed purpose of resuming settlement negotiations. Now, on the eve of the approval of a laboriously negotiated settlement, they seek to intervene. Certainly their intervention in this lawsuit at any of these earlier stages would have afforded them a much more meaningful opportunity to assert their interests, and certainly they must have realized with each of these developments that their interests could be affected by impending events in the litigation. Especially in light of the significant prejudice to other parties that would now result from upsetting this precarious settlement or from delaying its approval and implementation any longer, we would be inclined to deny petitioners' motion as untimely. However, we must give serious consideration to petitioners' contention that their tardiness was due to their late discovery that the POA was not adequately representing their interests. In this posture the adequacy of representation issue becomes entwined with and crucial to the timeliness question. To that we now turn.

The case of *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501 (3d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976), is very instructive in resolving the issues of timeliness and adequacy of representation. In that case, the Commonwealth of Pennsylvania and several black firefighters sued various officials of the City of Philadelphia, alleging that the employment practices of the Philadelphia Fire Department were racially discriminatory. In July 1974, the district court issued a preliminary injunction against further discriminatory hiring practices and imposed a racial quota on further hiring. Final hearing was set for early December, but was continued as settlement negotiations commenced. On December 27, the court issued an injunction *pendente lite* imposing quotas on future promotions. Within the next ten days a group of white firemen on the lieutenant's promotion list and the Fire Officers Union moved to intervene. However, before they had completed the filing

of procedurally proper motions to this effect, the court accepted stipulations from the parties settling individual claims and issued a final order providing hiring and promotional relief, including quotas. Noting the extensive publicity about the litigation that gave abundant and early notice of its potential effects on the firefighters' rights, and concluding that the city and the fire department had adequately protected the firefighters' interests, the court denied their motion as untimely. 66 F.R.D. 598 (E.D.Pa.1975).

On appeal, the applicants for intervention argued to excuse the lateness of their motion because they were "lulled into nonaction" by misrepresentations by counsel for the city that the case was being vigorously defended, when it was not. The Third Circuit rejected the contention that the city had abandoned their interests by agreeing to quota relief in the consent decree. The court stated that acceptance of a consent decree does not establish inadequate representation:

> [A]ny case, even the most vigorously defended, may culminate in a consent decree. . . . [A] consent decree may simply be "the inescapable legal consequence of application of fundamental law to [the] facts. That [intervenors] would have been less prone to agree to the facts and would have taken a different view of the applicable law does not mean that the [defendants] did not adequately represent their interests in the litigation." . . . We . . . reject any . . . contention that representation becomes inadequate whenever the representative is unsuccessful in urging a position: adequate representation may or may not be successful representation.

530 F.2d at 505–06 (quoting *United States v. Board of School Commissioners*, 466 F.2d 573, at 575 (7th Cir. 1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973)). The appellate court found that the record established that the city's representation had been vigorous and professional, and that there was no misrepresentation

regarding the adequacy of opposition to the promotion aspects of the decree. The court affirmed the denial of the motion as untimely.

The Ninth Circuit has also provided guidance on the adequacy of representation issue. In *Blake v. Pallan*, 554 F.2d 947 (9th Cir. 1977), the court set out three factors to consider:

(1) Are the interests of a present party in the suit sufficiently similar to that of the absentee such that the legal arguments of the latter will undoubtedly be made by the former; (2) is that present party capable and willing to make such arguments; and (3) if permitted to intervene, would the intervenor add some necessary element to the proceedings which would not be covered by the parties in the suit?

554 F.2d 954-55.

We can conclude without reservation that the leadership of the POA and its counsel have adequately represented the interests of the petitioner sergeants in their negotiation of and agreement to the proposed consent decree, and indeed throughout this litigation. Initially we state for the record our opinion that counsel for the POA have displayed the highest professional competence as vigorous and aggressive advocates of the rights and interests of the members of the POA. With specific regard to the promotional opportunities of these sergeants, the POA has made formal requests to the Civil Service Commission that the overdue 1976 lieutenants exam be given. Its acceptance of the consent decree was certainly made with the realization that the exam would not be given by the City during the pendency of this litigation, so that agreeing to its delay imposed no comparative disadvantage.[1] The POA zealously sought to protect the seniority system before grudgingly agreeing to its temporary modification. In the spring of 1978 the POA strenuously objected to a tentative settlement reached by the plaintiffs and the City, primarily because of its adverse effects on the seniority rights and promotional expectations of its members. The POA's opposition to that proposal was a very significant factor in its eventual rejection by the San Francisco Board of Supervisors. The POA's continued opposition to quotas and preferences is similarly an important reason for their absence from this proposed decree.[2] Moreover, sergeants in particular were well represented in the actual negotiation of this decree, as the president of the POA, several members of the negotiating team, and several members of its Board of Directors, which recommended approval of the proposal to the members, were sergeants.[3]

These facts satisfy the *Blake* criteria and present an even stronger case for denying intervention than was presented in *Rizzo*. Not only were the petitioners well represented by their union, but also the necessity for intervention is not as compelling here since the sergeants have already been permitted to present their objections to the court at the fairness hearing, and the

1. See our accompanying order approving the consent decree for a discussion of these compromises.

2. The absence of quotas and preferences from the decree is particularly notable, and a tribute to the effectiveness of the POA's efforts, in light of the real possibility of court-imposed affirmative relief had this case not settled. See the discussion of the sergeants objections in the accompanying order approving the decree.

3. We also dismiss the petitioners' allegations of misrepresentation regarding the date of the next lieutenant's exam. The petitioners claim that representatives of the POA promised them that the next exam would be administered in 1981, in spite of the express terms of the consent decree on this point that might have delayed it until 1983. In fact the final decree as approved by this court provides that the exam might be given as early as 1981, but that it will not have to be delayed any longer than July 1982. Although these petitioners might have been confused in this regard, they have not shown that POA representatives misrepresented these facts to the membership. Furthermore, we cannot find that possible confusion on this point would have affected the approval vote of the POA membership nor that it detracts from the adequacy of the representation of petitioners' interests by the POA.

830

court has given them serious consideration in its decision on the decree.[4]

In sum, we find that the petitioners' interests have been and are being adequately represented by an existing party. Further, in light of the timing of the motion to intervene and the considerable prejudice to other parties in allowing intervention, we find their application to be untimely. We conclude that the petitioners have not established their right to intervene under rule 24(a)(2).

For similar reasons, we decline to grant them permission to intervene under rule 24(b)(2)

IT IS HEREBY ORDERED that petitioners' motion for leave to intervene is denied.

---

4. See the discussion of the sergeants' objections in the accompanying order approving the decree.