890 F.2d 1438
 51 Fair Empl.Prac.Cas. 1542,
52 Empl. Prac. Dec. P 39,498, 15 Fed.R.Serv.3d 782
 Fontaine DAVIS, Eric H. Washington; Jerilyn North; Robert
L. Demmons; Jimmie Braden; Audry Lee; Early Davis;
Brandi Swanson; Susan Moorehead; Anne Young; Mary M.
Carder; Theresa Rodigou; Kathleen J. Bradshaw; Patricia
Murray; International Association of Black Firefighters-San
Francisco Chapter; United States of America, Plaintiffs-Appellees,
v.
CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation,
et al.; Defendants-Appellees,
John W. Flaherty; Edward E. Murphy; William M.
Shaughnessy; Alfred E. Smyth; Respondents-Appellants,
San Francisco Firefighters, Local 798,
Defendant-Intervenor-Appellant.
UNITED STATES of America, Plaintiff,
and
Fontaine Davis, et al., Plaintiffs in Intervention/Appellees,
v.
CITY AND COUNTY OF SAN FRANCISCO, et al., Defendant-Appellee,
v.
SAN FRANCISCO FIREFIGHTERS LOCAL 798, Defendant in
Intervention/Appellant (Four Cases).
Fontaine DAVIS, et al., Plaintiffs-Appellees,
v.
CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants-Appellees,
v.
SAN FRANCISCO FIREFIGHTERS LOCAL 798, Defendant in
Intervention/Appellant (Three Cases).
Fontaine DAVIS, Plaintiff-Appellee,
v.
CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants-Appellees,
v.
SAN FRANCISCO FIREFIGHTERS LOCAL 798, Defendant in
Intervention/Appellant.
 Nos. 88-1905, 88-2735, 88-2884, 88-15473 and 88-15474.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 5, 1989.
Decided Dec. 4, 1989.
 
 Duane W. Reno, Davis Reno & Courtney, San Francisco, Cal., for defendant in intervention-appellant.
 William C. McNeill, III, Employment Law Center, San Francisco, Cal., for plaintiffs in intervention-appellees.
 Louise H. Renne, City Atty., Dan Siegel, Chief of Complex Litigation, San Francisco, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before FARRIS, THOMPSON and TROTT, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 Appellant San Francisco Firefighters Local No. 798 ("the Union") challenges a consent decree executed by the City and County of San Francisco ("the City") and various individuals and organizations who intervened as plaintiffs in the underlying suit (hereinafter collectively referred to as "Davis").[1] The consent decree settled Title VII class action litigation in which it was contended that the San Francisco Fire Department (the "SFFD") and the City discriminated in hiring and promoting firefighters based on gender, race and national origin.
 
 
 2
 The Union contends the decree is not fundamentally fair as required by Fed.R.Civ.P. 23(e) and its affirmative relief violates the equal protection provisions of the fourteenth amendment and Title VII. The Union also challenges the district court's denial of its motion to enjoin the City from using a new method to assign seniority to firefighters promoted pursuant to the terms of the decree. We affirm the district court's approval of the consent decree.
 
 
 3
 Prior to approving the decree, the district court granted the plaintiffs' motion for partial summary judgment and enjoined the defendants from engaging in any unlawful discrimination. This injunction ("the 1987 injunction") was included as section A of the district court's order in its judgment filed February 26, 1987. United States v. City and County of San Francisco, 656 F.Supp. 276, 289-90 (N.D.Cal.1987) ("Davis I ").[2] Thereafter, the Davis plaintiffs filed a motion in the district court seeking to hold the City in contempt for violating the 1987 injunction. On January 14, 1988, the district court held a contempt hearing. As a result of this hearing, rather than finding the City in contempt, the district court issued an unpublished injunction which it filed February 5, 1988 ("1988 injunction"). This injunction required specified officers of the SFFD to carry out and ensure compliance with a variety of measures designed to end racial and sexual discrimination and harassment at the SFFD. The union and the SFFD officers named in the 1988 injunction (collectively "Union") appeal. We affirm the district court's grant of the 1988 injunction.
 
 
 4
 We first analyze the Union's appeal of the district court's approval of the consent decree. We then consider the Union's appeal of the 1988 injunction. Finally, we consider the appellees' request for attorney fees.
 
 PART ONE: THE CONSENT DECREE
 
 5
 * BACKGROUND
 
 
 6
 The consent decree settles extensive state and federal litigation concerning claims of discrimination dating back to 1970. The district court opinion approving the decree describes in detail the legal and factual history of this litigation. United States v. City and County of San Francisco, 696 F.Supp. 1287, 1289-98 (N.D.Cal.1988) ("Davis III "). We set out a brief summary below.
 
 A. Prior Entry-Level Litigation
 
 7
 Until 1955, the SFFD had hired no Black firefighters. Women had been barred from applying until 1976, and the first woman firefighter was not hired until August 1987. The NAACP and several community groups filed a federal suit in 1970 challenging entry-level hiring practices on the sole ground of racial discrimination under 42 U.S.C. Secs. 1981 and 1983. Western Addition Community Org. [WACO] v. Alioto, 330 F.Supp. 536 (N.D.Cal.1971) ("WACO I" ). The district court found the entry-level exam had a disparate impact on minorities and the City had failed to show the exam's components were job-related. Id. at 539-40.
 
 
 8
 The City unsuccessfully revised its entry-level firefighter exam. The district court invalidated the new test. It ruled that no job analysis had been conducted and therefore the court could not determine whether the exam was reasonably related to job requirements. Western Addition Community Org. [WACO] v. Alioto, 340 F.Supp. 1351, 1356 (N.D.Cal.1972) ("WACO II "). A second revision was rejected when the City failed to empirically validate the new test. Western Addition Community Org. [WACO] v. Alioto, 360 F.Supp. 733, 739 (N.D.Cal.1973) ("WACO III ").
 
 
 9
 The district court granted affirmative relief in 1973 after the City failed to either validate the entry-level test or formulate a new one. Western Addition Community Org. [WACO] v. Alioto, 369 F.Supp. 77 (N.D.Cal.1973) ("WACO IV "), appeal dismissed as moot, 514 F.2d 542 (9th Cir.) (per curiam), cert. denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). The court ordered one-for-one White to minority hiring from the 1973 entry-level list, regardless of rank, until the list of qualified applicants--those who had answered at least fifty of the 100 written questions correctly and had passed the oral and athletic exams--was exhausted. Id. at 80-81.
 
 
 10
 The WACO litigation was settled in 1977 by a five-year consent decree which established guidelines for using exam components, included no affirmative relief and set a goal of 40% minority representation on the entry-level list. Western Addition Community Org. [WACO] v. Alioto, No. C-70-1335 WTS, slip op. at 9-10 (N.D.Cal. May 18, 1977) ("WACO V ").
 
 B. Prior Promotional Litigation
 
 11
 In 1980 Black firefighters filed complaints with the California Department of Fair Employment Housing ("DFEH"). They alleged that the 1978 exam for promotions to lieutenant was discriminatory. Following an administrative hearing, the DFEH's successor, the California Fair Employment and Housing Commission ("FEHC"), determined the 1978 exam had an adverse impact on Blacks and the City had failed to show the exam was job-related. See City and County of San Francisco v. Fair Employment and Housing Comm'n [FEHC], 191 Cal.App.3d 976, 981, 236 Cal.Rptr. 716 (1987) (upholding FEHC decision because supported by substantial evidence) ("FEHC ").
 
 
 12
 The state court of appeals concluded that the FEHC had established a prima facie case of discrimination based on a significant disparity between the passing rates of White and Black applicants. Under the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. 1607.4(D) (1988), a selection rate among minority applicants of less than 80% of the group with the highest selection rate (usually Whites) is strong evidence of adverse discrimination. On the 1978 lieutenant promotion exam, the ratio of the pass rate of Blacks to that of Whites was 38%; the pass rate ratio was 65% for Hispanics and 13% for Asian/other firefighters. Davis III, 696 F.Supp. at 1294.
 
 
 13
 The court further found that the primary component of a lieutenant's job was supervision. Consequently, the City had failed to show the exam was job-related because it did not test supervisory skills and the City had shown no correlation between exam results and performance as a lieutenant. FEHC, 191 Cal.App.3d at 990, 236 Cal.Rptr. 716.
 
 
 14
 C. Current Litigation Underlying the Consent Decree
 
 
 15
 The City administered a new entry-level test in 1982-83 and new promotion tests for lieutenant and fire inspector in 1984. Following publication of the results of the entry-level test, the United States and the plaintiff-intervenors brought separate suits against the City under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982), and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. Sec. 6701 et seq. (1982) (repealed 1986).[3] The actions sought relief for the City's failure to correct the effects of past discrimination and for the continued use of invalid hiring exams and practices which adversely impacted women and minorities.
 
 
 16
 The district court found the written component of the 1982-83 entry-level exam produced a passing rate of 59% for Blacks, 74% for Hispanics and 69% for Asians in relation to the passing rate for White applicants. Davis III, 696 F.Supp. at 1296. The passing rate on the second component of the exam, the Physical Agility Test ("PAT"), was 91% for Blacks, 84% for Hispanics, 73% for Asians and 36% for women, compared with White applicants. Because applicants had to pass the written exam before they could take the PAT, 66% of the top 190 scorers on the entire exam who were certified to the eligibility list were White. Nineteen percent were Black, 5% were Hispanic, 8% were Asian and none were women. Id.
 
 
 17
 The district court enjoined the City's use of the entry-level test results for hiring purposes and granted partial summary judgment on the claims that the exam adversely impacted Blacks and the PAT adversely affected women. Id. In October 1986, on the eve of trial of the remaining issues, the City withdrew the entry-level tests and announced it would not defend the promotional tests. Id. In February 1987 the district court found that the facts established a prima facie violation of Title VII and granted the plaintiffs' motion for partial summary judgment. Davis I, 656 F.Supp. 276, 282 and 288. The court also provided for interim hiring and permanently enjoined the City and SFFD from further violating Title VII. Id. at 289-92. Large portions of the injunction subsequently were incorporated into the consent decree.
 
 D. The Consent Decree
 
 18
 The consent decree was filed with the court on November 12, 1987. A fairness hearing was held on December 22, 1987, and the decree was approved by court order on June 10, 1988. Both the United States and the Union opposed the decree. The United States did not participate in negotiations leading up to the settlement. The Union participated, objected to the terms and did not sign the decree. Consequently the Union is not a party to it.
 
 
 19
 The terms of the decree are set out in full in Appendix A to the district court's opinion in Davis III, 696 F.Supp. at 1311.
 
 II
 JURISDICTION
 
 20
 The Union appeals two district court orders approving the consent decree. We have jurisdiction to hear these appeals pursuant to 28 U.S.C. Secs. 2106 and 1292(a)(1). The Union also appeals two orders denying its request for an injunction barring the City's assignment of seniority to firefighters promoted pursuant to the decree. We have jurisdiction to decide these appeals under 28 U.S.C. Sec. 1292(a)(1).
 
 III
 ANALYSIS
 A. Fairness
 1. Standard of Review
 
 21
 Under Fed.R.Civ.P. 23(e), a class action settlement agreement requires district court approval.[4] The district court reviews the decree under a "universally applied standard" to determine whether the settlement is "fundamentally fair, adequate and reasonable." Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco, 688 F.2d 615, 625 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983).[5]
 
 
 22
 A district court's approval of a consent decree is reviewed for abuse of discretion. Officers for Justice, 688 F.2d at 625-26. An appellate court will reverse approval of a consent decree "only upon a strong showing that the district court's decision was a clear abuse of discretion." Id. at 626. Factual findings supporting the order approving the decree are accorded "great weight," and the appellate court will not substitute its notions of fairness for those of the district judge and the parties to the agreement. Id.
 
 2. Analysis
 
 23
 In deciding whether a consent decree is fair, adequate and reasonable, the district court must balance several factors, including but not limited to: strength of the plaintiffs' case; risk, expense, complexity and possible duration of continued litigation; relief offered in settlement; extent of discovery already completed; stage of proceedings; experience and views of counsel; governmental participation; and reaction of the class members. Officers for Justice, 688 F.2d at 625. The degree of importance attached to each factor is determined by the nature of the claim, the type of relief sought and the facts and circumstances of each case. Id.
 
 
 24
 We find nothing in the record to indicate any abuse of discretion by the district court in approving the decree pursuant to Fed.R.Civ.P. 23(e). As a result of the fairness hearing held December 22, 1987, the district court found the plaintiff-intervenors' case was strong; the City had many risks in continuing with litigation, including the risk of being found liable for intentional racial discrimination; discovery was virtually complete; trial on harassment issues would have been long and complex; and publication of evidence would have embarrassed and demoralized the SFFD. Davis III, 696 F.Supp. at 1305.
 
 
 25
 We conclude that the district court did not abuse its discretion in determining that the decree is fundamentally fair, adequate and reasonable.
 
 
 26
 B. Constitutional and Statutory Considerations
 
 
 27
 An affirmative action plan executed by a municipality constitutes state action and must comport with the equal protection provisions of the fourteenth amendment and Title VII. Local 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 517 n. 8, 106 S.Ct. 3063, 3072 n. 8, 92 L.Ed.2d 405 (1986). The district court set out in detail its constitutional and Title VII analysis. See Davis III, 696 F.Supp. at 1307-11.
 
 
 28
 It is well-settled that governmental bodies may constitutionally employ racial classifications essential to remedy a past practice of unlawful treatment of racial or ethnic groups subject to discrimination. United States v. Paradise, 480 U.S. 149, 166, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (affirming court-ordered hiring quotas to remedy past discrimination against minorities in hiring of state troopers). In doing so, both equal protection and Title VII concerns must be satisfied. To this end, there must be (1) adequate justification for the use of affirmative action, and (2) the decree must not unnecessarily burden the rights of the nonminority employees. Johnson v. Transp. Agency, Santa Clara County, 480 U.S. 616, 627-30, 107 S.Ct. 1442, 1449-51, 94 L.Ed.2d 615 (1987); Higgins v. City of Vallejo, 823 F.2d 351, 356-57 (9th Cir.1987), cert. denied, --- U.S. ----, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).
 
 1. Equal Protection
 
 29
 a. Standard of Review
 
 
 30
 Race-based remedies to alleviate past discrimination are subject to some level of elevated scrutiny to pass muster under the equal protection clause. United States v. Paradise, 480 U.S. at 166 & n. 17, 107 S.Ct. at 1064 & n. 17 (citing Wygant v. Jackson Board of Education, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) ("means chosen must be 'narrowly tailored' to achieve a 'compelling government interest' ")). The Supreme Court recently adopted the Wygant plurality's strict scrutiny analysis in striking down a city ordinance which created a minority set-aside program for municipal construction contracts where it was not shown that the city had discriminated against minorities in the past. City of Richmond v. J.A. Croson Co., --- U.S. ----, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989).
 
 
 31
 The district court properly employed the strict scrutiny analysis set forth in Wygant, and the "strong basis in evidence" standard articulated by Justice O'Connor in Croson. The district court also reviewed the decree to determine whether it was "narrowly tailored to serve a compelling governmental purpose." Davis III, 696 F.Supp. at 1301-02 (quoting Paradise, 480 U.S. at 166 & n. 17, 107 S.Ct. at 1064 & n. 17). The court concluded that the City had a valid "compelling governmental purpose" in adopting an affirmative action plan--"to remedy the City's pattern and practice of discrimination in hiring and promotion on the basis of race and sex." Davis III, 696 F.Supp. at 1307 (citing Johnson, 107 S.Ct. at 1452 [480 U.S. at 631-32]; Paradise, 107 S.Ct. at 1065 [480 U.S. at 167-70].
 
 
 32
 b. Justification
 
 
 33
 The Union contends the evidence does not justify the decree's affirmative relief because most of the effects of discrimination that the decree was intended to remedy were alleviated by prior court action. The Union further argues there was insufficient evidence to justify the relief granted. The district court addressed these arguments in its order approving the decree. See Davis III, 696 F.Supp. at 1308. It found the arguments to be unpersuasive. Id. So do we.
 
 
 34
 i. Prior Relief
 
 
 35
 The Union argues that prior relief resulting from the WACO litigation precludes the affirmative relief afforded by the consent decree. The WACO litigation, however, involved discrimination only against Blacks in entry-level hiring. The WACO court enjoined the City from hiring based on invalid examinations, set lower cut-off scores for new examinations, and ordered one-for-one minority hiring which lasted from 1973 until a consent decree was signed in 1977. The WACO consent decree expired in 1982, contained no affirmative action provisions and set a hiring goal of 40% minorities for the makeup of the entry-level eligibility lists.
 
 
 36
 The litigation underlying the consent decree before us involves both entry-level hiring and promotions of Asians, Blacks, Hispanics and women. The WACO litigation, therefore, cannot provide relief to Asians, Hispanics or women who have been discriminated against at both the entry-level and promotion level, or to Blacks who have been discriminated against in promotions.
 
 
 37
 The Union's argument also overlooks the City's failure to comply with the WACO consent decree's mandate to formulate new, valid examinations. The Union contends that because the City permanently was enjoined from using invalid exams, and ordered to write valid ones, the discrimination suffered by minorities and women resulting from past use of invalid exams was remedied, and there was no need for affirmative relief in the consent decree. We disagree.
 
 
 38
 In Paradise, the Supreme Court approved court-ordered affirmative relief where Alabama had consistently resisted court orders and had failed to live up to them. Paradise, 480 U.S. at 170-71, 107 S.Ct. at 1066-67. The Court found that "[t]he race-conscious relief at issue here is justified by a compelling interest in remedying the discrimination that permeated entry-level hiring practices and the promotional process alike." Id. at 170, 107 S.Ct. at 1066 (footnote omitted). The present situation is strikingly similar.
 
 
 39
 ii. Sufficiency of Evidence
 
 
 40
 The Union argues that because the court found insufficient evidence to justify court-ordered race-based hiring, the evidence is also insufficient to support voluntary hiring goals. The Union relies on a statement made by the court in a February 26, 1987 order in which the court enjoined the City from using invalid exams for promotions but declined to order mandatory hiring goals. We reject this argument.
 
 
 41
 The district court found that the statistical disparities between the numbers of minorities and women hired in the fire department and the numbers of minorities and women residing in the City constituted a "strong basis in evidence" sufficient to establish a prima facie case of past discrimination and justify the affirmative action provisions in the decree. Davis III, 696 F.Supp. at 1302. Because all hiring in the fire department is entry-level and non-skilled (all promotions occur from within the ranks), the court properly could rely on statistics to determine whether a prima facie case of discrimination had been made out to justify the relief granted. Davis III, 696 F.Supp. at 1302; see Croson, 109 S.Ct. at 725 (gross statistical disparities may constitute prima facie proof of pattern or practice of discrimination under Title VII, and are probative of pattern of discrimination where no special qualification necessary) (citing Hazlewood School Dist. v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741-42, 53 L.Ed.2d 768 (1977)); see also Wygant, 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring) (dicta suggesting statistical disparity alone constitutionally may justify voluntary affirmative action); Paradise, 480 U.S. at 168 n. 18, 107 S.Ct. at 1065 n. 18 (judicial determination of prior discriminatory policies and conduct satisfy first prong (justification) of strict scrutiny test).
 
 
 42
 There was sufficient evidence to justify the consent decree's affirmative action provisions.
 
 
 43
 c. Narrowly Tailored
 
 
 44
 A consent decree may be struck down if it is not "narrowly tailored" to meet its objectives. Paradise, 480 U.S. at 171, 107 S.Ct. at 1066-67. In determining whether race-based remedies are narrowly tailored, several factors must be considered: necessity for the relief; efficacy of alternative remedies; flexibility and duration of the relief; waiver provisions; relationship of any numerical goals to the relevant labor market; and impact of relief on third parties. Paradise, 480 U.S. at 171, 107 S.Ct. at 1066-67.
 
 
 45
 The Union argues that the decree is not narrowly tailored because it allows blind (unqualified) hiring; contains rigid, fixed quotas; lasts for an unreasonable period of time; contains long-term hiring goals numerically unrelated to past harm; and trammels the rights of nonminorities by failing to provide for the promotion of White firefighters and by uprooting promotion expectations.
 
 
 46
 For the reasons stated by the district court in its opinion, Davis III, 696 F.Supp. at 1309-11, we conclude that these arguments, except as to the duration of the decree, are without merit. For the following reasons we hold that the duration of the decree must be modified.
 
 
 47
 In determining whether the duration of a decree is reasonable, courts look to the facts behind the decree. In Paradise, the Supreme Court upheld a court-ordered decree ordering one-for-one hiring of Blacks which had no ending date but terminated upon the development of promotion procedures which were not adverse to Blacks. Paradise, 480 U.S. at 178, 107 S.Ct. at 1070. The Court in Paradise approved the court-ordered relief which mandated that 50% of all promotions consist of Black candidates until 25% of the rank was Black, "but only until a promotion procedure without adverse impact on Blacks is in place." Paradise, 480 U.S. at 179, 107 S.Ct. at 1071. The district court in a prior order had mandated the hiring of 50% Black applicants until 25% of the state trooper force was Black. Id. The promotion order, therefore, reflected the percentage of Black troopers in the relevant labor market--the workforce. Id.
 
 
 48
 The present case presents a fact situation similar to Paradise, but involves a voluntary consent decree. The district court has ordered the hiring of minorities and women in percentages equal to their representation in the labor market--the City and County of San Francisco--and the promotion of minorities and women in percentages equal to their representation in the relevant labor market--the fire department. The decree does not, however, contain any provision to stop the use of its promotion mechanism when its valid promotion objectives have been met. To ensure that the result of the hiring and promotional procedures does not become unreasonable, we modify the seven-year duration of the decree to seven years or sooner upon the accomplishment of the objectives or the goals of the consent decree.
 
 2. Title VII
 
 49
 a. Manifest Imbalance
 
 
 50
 Under a Title VII analysis, voluntary adoption of a race-based remedy may be justified by showing that a "manifest imbalance" exists, reflecting underrepresentation of women and minorities in "traditionally segregated job categories." Johnson, 480 U.S. at 631, 107 S.Ct. at 1452; United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). This standard assures "that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination, and that the interests of those employees not benefiting from the plan will not be unduly infringed." Johnson, 480 U.S. at 632, 107 S.Ct. at 1452. The standard also prevents non-benefiting employees' rights from being "unduly trammeled" by the decree's provisions. Id. at 637, 107 S.Ct. at 1455.
 
 
 51
 To determine whether such an imbalance has occurred, the court may compare the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population. Id. Where the agreement is voluntary, the imbalance need not be sufficient to support a prima facie case of racial discrimination "since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans." Id. Because such an imbalance is evident from the facts in this case, we conclude this branch of the Title VII test has been met.
 
 
 52
 b. Nonminority Rights
 
 
 53
 Where a finding of manifest imbalance justifies a consent decree's affirmative relief, the decree may be approved provided it does not "unnecessarily trammel the interests of the White employees" or create an "absolute bar to the advancement of White employees." Johnson, 480 U.S. at 637, 107 S.Ct. at 1455 (voluntary affirmative action plan, Title VII analysis); Weber, 443 U.S. at 208, 99 S.Ct. at 2730; Higgins, 823 F.2d at 357.
 
 
 54
 The Union asserts the decree unnecessarily trammels the rights of White nonminority firefighters because it does not require the promotion of any of them. We disagree. Affirmative relief may be implemented only to remedy harm caused by past discrimination. See, e.g., Paradise, 480 U.S. at 167, 107 S.Ct. at 1065 (government bodies may use race-conscious classifications where essential to remedy unlawful treatment of minority groups subject to discrimination). No evidence has been presented showing discrimination against nonminority, White or male firefighters. Therefore, it would not be appropriate for the decree to mandate their promotion.
 
 
 55
 The Union argues that advancement of nonminorities has been absolutely barred because the decree provides for the mandatory promotion of minorities[6] and precludes competition by nonminorities for the slots set aside for minorities. We disagree.
 
 
 56
 The mandatory promotion of thirty-three minorities was balanced by the optional promotion of forty-eight additional firefighters, 75% of whom were nonminorities. The Supreme Court in Weber held a voluntary affirmative action plan reserving 50% of job openings for Black workers to remedy past discrimination did not create an absolute bar to advancement of nonminority employees because they could compete for the remaining 50% of job openings. Weber, 443 U.S. at 208, 99 S.Ct. at 2730. In the present case, only 25% of the forty-eight optional openings were reserved for minorities. In addition, preferential selection for promotions of minorities in the future will be based on the percentage of minorities in the relevant labor force--the fire department--allowing nonminorities to continue to compete for a large number of remaining positions.
 
 
 57
 We conclude that the decree meets the requirements of Title VII.
 
 C. Denial of Union's Request for Injunction
 
 58
 The Union appeals the district court's denial of its motion to enjoin the City from assigning seniority to seventy-five lieutenants promoted on June 30, 1988, pursuant to paragraph sixteen of the consent decree. The Union alleges it has standing to challenge the assignments because the City used a new method to determine the seniority of the seventy-five lieutenants. The Union asserts the district court must hold a fairness hearing before the City can use the new seniority method.
 
 
 59
 The district court found the Union lacked standing to challenge the seniority method because the Union was not a party to the decree, and in the alternative found no merit in the Union's arguments. Without deciding the standing issue, we affirm the district court's determination that the Union's arguments regarding the modified seniority system were meritless.
 
 
 60
 The existing seniority system was not applied to the new lieutenants because it was based on rankings derived from performance on the invalid 1984 promotional exam. According to the Union's evidence,[7] under the revised seniority method, the mandatory minority appointees were placed on the seniority list, with seniority among them determined by lot. The remaining discretionary appointees were then placed below the mandatory appointees, with their seniority also determined by lot. The Union argues that the discretionary appointees' rights were trammeled unnecessarily by the assignment of higher seniority to the Black, Hispanic and Asian lieutenants in the mandatory group. As support for this argument, the Union cites Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Stotts, however, is unhelpful to the Union. In Stotts, the Supreme Court overturned a district court order requiring the layoff of nonminorities with more seniority to assure that minorities with less seniority were not disadvantaged. Stotts, 467 U.S. at 579, 104 S.Ct. at 2588. Here, no incumbent lieutenant's seniority was affected by the manner in which seniority was assigned to the newly-promoted lieutenants. Rather, the new method was used only to assign seniority within the newly-promoted group. Thus, the district court did not abuse its discretion in finding the seniority method did not adversely impact the discretionary appointees.
 
 PART TWO: THE 1988 INJUNCTION
 
 61
 * BACKGROUND
 
 
 62
 We next consider the Union's appeal from the 1988 injunction. This injunction was issued following a contempt hearing in which the Davis plaintiffs had charged the City with violating the February 1987 injunction. The catalyst for the contempt hearing had been an incident involving a swastika placed in the office of two minority firefighters at an SFFD firehouse. At the hearing, the district court was presented with evidence concerning a number of other alleged discriminatory incidents. In addition, the court received a report, under seal, from a court-appointed monitor regarding the swastika incident and other incidents of racial harassment. The court also heard oral testimony.
 
 
 63
 The injunction was filed February 5, 1988. It incorporated provisions of an internal general order of the SFFD dated October 22, 1987 ("SFFD General Order"), and charged specified supervisory officers of the SFFD "with the immediate responsibility of carrying out this order and insuring compliance with it by all members of the SFFD under their supervision directly or indirectly." Among other provisions, the injunction required "that each station house be inspected and that any racially inflammatory or sexually inflammatory materials be removed and destroyed [; and that] all station houses shall remain free of such materials." The injunction required prompt compliance with its terms, and specified that persons found guilty of violating it could be found in contempt of court and fined or imprisoned, or both.
 
 
 64
 The Union challenges the injunction on the grounds that it improperly incorporates by reference material from the SFFD General Order, was issued without proper findings of fact, and is not supported by substantial evidence.
 
 II
 ANALYSIS[8]
 
 65
 The decision to grant or deny injunctive relief is reviewed for abuse of discretion. S.E.C. v. Arthur Young & Co., 590 F.2d 785, 787 (9th Cir.1979). Conclusions of law upon which the injunction is based "are freely reviewable." Sports Form, Inc. v. U.P.I., 686 F.2d 750, 752 (9th Cir.1982).
 
 A. Incorporation of the SFFD General Order
 
 66
 Federal Rule of Civil Procedure 65(d) by its terms prohibits incorporation by reference of another document into an injunctive order.[9] The Union argues that the incorporation by the district court of sections of the SFFD General Order into its 1988 injunction violated Rule 65(d) and was an abuse of discretion which requires reversal.
 
 
 67
 The law of this circuit is that "[o]rdinarily, an injunction should not incorporate by reference another document." Henry Hope X-Ray Products, Inc. v. Marron Carrel, Inc., 674 F.2d 1336, 1343 (9th Cir.1982). The Union cites language in the opinions of other circuits which appears to read the incorporation requirement very strictly. See, e.g., Thomas v. Brock, 810 F.2d 448, 450 (4th Cir.1987) (the requirements of rule 65(d) "are mandatory and must be observed in every instance") and H.K. Porter Co., Inc. v. National Friction Products Corp., 568 F.2d 24, 27 (7th Cir.1977) (ignoring rule's mandatory requirement serious and decisive error). This circuit, however, has not taken a rigid approach to Rule 65(d). For example, in Henry Hope X-Ray, we held that the district court did not err in failing to attach a confidential appendix to its order, where the appendix was transmitted to the parties. Henry Hope X-Ray, 674 F.2d at 1343.
 
 
 68
 The primary purpose of Rule 65(d) is to assure adequate notice to parties faced with the possibility of contempt. Henry Hope X-Ray, 674 F.2d at 1343. See also International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967). Here, the document incorporated into the 1988 injunction consisted of fire department rules already binding upon the officers of the SFFD. It is unlikely the officers could argue they were unaware of these rules.
 
 
 69
 We conclude that the district court's failure to cause a copy of the SFFD General Order to be stapled to the 1988 injunction does not require reversal of the court's grant of the injunction.[10] In view of the language of Rule 65(d), however, by separate order filed herewith we order that copies of the incorporated SFFD General Order be attached to the 1988 injunction and served upon the affected parties.
 
 B. The District Court's Findings
 
 70
 The Union also contends that the district court failed to comply with Fed.R.Civ.P. 52(a),[11] which requires the trial court to set forth findings of fact and conclusions of law supporting any order granting an injunction; and that as a result we should reverse the order granting the 1988 injunction.
 
 
 71
 "Failure to comply with Rule 52(a) does not require reversal unless a full understanding of the question is not possible without the aid of separate findings." See Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir.1986). Thus we will affirm "if the findings are sufficiently comprehensive and pertinent to the issues to provide a basis for decision." Id.
 
 
 72
 The rule specifically permits the district court to make its findings orally. See Rule 52(a). The district court's oral findings are accurately restated in its subsequently published opinion in Davis III, 696 F.Supp. at 1297-98. In essence, the district court found that foot-dragging by the SFFD in enforcing its own internal order and the district court's February 1987 injunction required the district court to order SFFD officers to act more expeditiously in investigating and punishing alleged incidents of wrongdoing. The district court felt there was a need to make the officers of the SFFD directly answerable to the court. That this was the basis for imposing the injunction is plainly apparent from the record. Our appellate review is not impeded by the manner in which the district court made its findings. We conclude that Rule 52(a) has been satisfied. See Dekar Industries, Inc. v. Bissett-Berman Corp., 434 F.2d 1304, 1305 (9th Cir.1970), cert. denied, 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971).
 
 C. Sufficiency of Evidence
 
 73
 The Union argues that the 1988 injunction should be overturned because the evidence presented at the January 14, 1988 hearing was insufficient to support a finding of contempt. The district court, however, made no finding of contempt. The injunction is an order which threatens contempt, after a hearing, in the event of future misconduct. Whether there was sufficient evidence for a finding of contempt is irrelevant.
 
 
 74
 Even if the Union's argument is read to raise the question of sufficiency of the evidence regarding "foot-dragging" by the SFFD, the district court did not abuse its discretion in issuing the injunction. The court had been involved in this case for years, and was extremely familiar with its history. See generally Davis III, 696 F.Supp. 1287. In addition, ample evidence of foot-dragging was presented in the report of the court monitor and through Chief Phipps' testimony at the hearing.[12]
 
 D. Due Process
 
 75
 Finally, the Union urges reversal on the ground that issuance of the injunction violated the due process rights of the officers charged with carrying out its mandate. The Union contends that because these officers "had no opportunity to appear at the hearing in their individual capacities and present personal defenses to the granting of the [injunction]," their due process rights were violated.
 
 
 76
 This argument is based on an out-of-context quotation from Wright & Miller which is completely inapposite here. See 11 C. Wright & A. Miller, Federal Practice and Procedure Secs. 2956 at 568 (1973). The passage does not suggest, as the Union argues, that the individual officers bound by the court's order need have appeared at the January 14, 1988 hearing to be properly bound by the 1988 injunction. The officers are employees of the City, a party to this litigation, and as such are enjoinable under Rule 65(d). The Wright & Miller quotation explains why notice to such employees is necessary, but also why they need not necessarily appear personally to be bound.
 
 
 77
 The Union also argues that the language of the injunction is overbroad and so vague that it violates the due process rights of the officers. This argument is premature. No due process violation has occurred. At such time as enforcement of the injunction may be sought, officers affected may present this argument, along with any other defenses they may have, including any evidence of inability to comply or good faith attempts at compliance. See NAACP, Jefferson County Branch v. Brock, 619 F.Supp. 846, 849-50 (D.C.D.C.1985); Aero Corp. v. Dept. of Navy, 558 F.Supp. 404, 428 (D.C.D.C.1983).
 
 
 78
 We conclude that the district court did not abuse its discretion in granting the 1988 injunction.
 
 
 79
 PART THREE: REQUEST FOR ATTORNEY FEES ON APPEAL
 
 
 80
 The Davis plaintiffs seek attorney fees for this appeal pursuant to section 706(k) of Title VII, 42 U.S.C. Sec. 2000e-5(k), the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. Sec. 1988, and Ninth Circuit Rule 28-2.3.
 
 
 81
 Under section 2000e-5(k), "the court ... may allow the prevailing party ... a reasonable attorney's fee as part of costs...." The appellate court has discretion to award attorney fees on appeal to prevailing parties as part of costs in Title VII cases. Harmon v. San Diego County, 736 F.2d 1329, 1331 (9th Cir.1984) (fee awards may be awarded for time spent on appeal to prevailing parties).
 
 
 82
 The Supreme Court recently considered whether attorney fees may be awarded against a third party intervenor in a Title VII action. Independent Federation of Flight Attendants v. Zipes, --- U.S. ----, 109 S.Ct. 2732, 2733, 105 L.Ed.2d 639 (1989). The Court held that attorney fees should be awarded to a Title VII prevailing party against an intervenor only where the intervenor's actions were "frivolous, unreasonable, or without foundation." Id. 109 S.Ct. at 2736. Here, as in Zipes, the Union intervened to protect the interests of incumbent employees, an act that was neither frivolous, unreasonable or without foundation. Id. at 2738-39. Following the reasoning in Zipes, we decline to award attorney fees as costs to Davis for this appeal.
 
 CONCLUSION
 
 83
 The district court did not abuse its discretion in concluding that the consent decree is fundamentally fair, adequate and reasonable and comports with the equal protection provisions of the fourteenth amendment and the requirements of Title VII. We modify the decree's term, however, to seven years or earlier upon the achievement of its goals and objectives.
 
 
 84
 The district court did not err in denying the Union's motion to enjoin the City from assigning seniority to firefighters promoted pursuant to the terms of the consent decree.
 
 
 85
 The district court did not abuse its discretion in granting the 1988 injunction.
 
 
 86
 The Davis plaintiffs' request for attorney fees for this appeal is denied.
 
 
 87
 AFFIRMED.
 
 
 
 [1]
 Plaintiff-intervenors are Fontaine Davis, Eric H. Washington, Jerilyn North, Robert L. Demmons, Jimmie Braden, Audry Lee, Early Davis, Brandi Swanson, Susan Moorehead, Anne Young, Mary M. Carder, Theresa Rodigou, Kathleen J. Bradshaw, Patricia Murray, Chinese for Affirmative Action ("CAA") and the Mexican American Legal Defense Fund ("MALDEF")
 
 
 [2]
 The 1987 injunction provided in pertinent part:
 Defendants are permanently enjoined from engaging in any act or practice that has the purpose or effect of unlawfully discriminating against any employee of, or any applicant for employment with, the San Francisco Fire Department because of such individual's race, sex, or national origin, and specifically from unlawfully discriminating at any time on the basis of race, sex, or national origin in hiring, promotion, upgrading, training, assignment, discharge, compensation, and terms and conditions or privileges of employment....
 Davis I, 656 F.Supp. at 289-90.
 
 
 [3]
 The United States sued on behalf of Black, Asian and Hispanic applicants; the plaintiff-intervenors sought relief for women and Blacks and included claims of racial harassment. Asian and Chinese intervenors subsequently joined the suit. The actions were consolidated in 1986
 
 
 [4]
 Rule 23(e) provides in pertinent part:
 A class action shall not be dismissed or compromised without the approval of the court....
 Fed.R.Civ.P. 23(e). See also Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco, 688 F.2d 615, 623 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983).
 
 
 [5]
 This circuit has stated that the primary purpose of the court approval requirement of Fed.R.Civ.P. 23(e) is to protect the interests of class members who may not have received due consideration by those negotiating the settlement. Id. at 624. It is therefore unclear whether the Union has standing to challenge the decree under the fairness provisions of Fed.R.Civ.P. 23(e), or whether it is confined to challenges under Title VII and the Constitution. See Williams v. Vukovich, 720 F.2d 909, 921 (6th Cir.1983) (court is under mandatory duty to consider fairness to those affected, adequacy of settlement to the class, and public interest); Moore v. City of San Jose, 615 F.2d 1265, 1272 (9th Cir.1980) (district court must inquire into effect of retroactive seniority provisions on incumbent employees). The Union does not assert any fairness challenge based on retroactive seniority. We do not decide the standing question. Rather, for purposes of this opinion we assume, without deciding, that the Union has standing to challenge the fairness of the consent decree
 
 
 [6]
 The Union also argues that these mandatory promotions were not necessary because "there was no demonstrated or urgent need to make promotions before the new examinations were ready." This argument ignores the City's historical inability to devise an examination lacking adverse impact on minorities. The City also states in its brief that "there was a necessity for the Department to fill many vacancies in the position of lieutenant" when the consent decree was executed. This statement has not been refuted by the Union
 
 
 [7]
 Although the district court foreclosed the Union's presentation of evidence on the issue, the Union presented its evidence directly to this court when it filed a motion for a stay order on October 5, 1988. The motion was denied
 
 
 [8]
 The Union lists among the issues presented to this court the question whether the 1988 injunction qualifies as an "order granting an injunction" for section 1292(a)(1) jurisdictional purposes. The Union correctly argues that it is such an order. We conclude that we have appellate jurisdiction under 28 U.S.C. Sec. 1292(a)(1)
 
 
 [9]
 Rule 65(d) provides:
 Every order granting an injunction and restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.
 Fed.R.Civ.P. 65(d).
 
 
 [10]
 The Union argues that because the SFFD General Order is subject to revision by the City at any time, adequate notice of what is enjoined is unattainable. The 1988 injunction, however, refers specifically to the SFFD General Order dated October 22, 1987, and not to the SFFD General Order "as revised."
 
 
 [11]
 Federal Rule of Civil Procedure Sec. 52(a) provides in relevant part:
 ... in granting or refusing interlocutory injunctions the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action.
 Fed.R.Civ.P. 52(a).
 
 
 [12]
 The Union questions the competency of some of the evidence presented at the hearing, specifically affidavits presented to the district court alleging numerous incidents of discrimination and harassment. But the district court seemed to rely primarily, if not exclusively, on the testimony of Chief Phipps and the monitor's report, neither of which is challenged here. See Davis III, 696 F.Supp. at 1297-98